## John W. Hulin and others v. The People.

*Clerk of state prison : Suit on official bond : Parties : Agent : People : Statute construed.* A suit on the bond of· the clerk of the state prison is properly brought by the people through the attorney general; the statute (*Comp. L. 1871*, § *8069*) requiring this bond and that of the agent of the state prison to be · filed with the auditor general, indicates an intention to keep them separate from those matters which, by another section (§ *8072*) of the same chapter, are confided to the agent; and where two officers are required to concur in certifying to important accounts, it would need strong and undoubted expression to justify a conclusion that one of them was to have exclusive charge of prosecutions against the other, which might depend on that very accounting.

*Board of inspectors: Time of meeting : Legality of meeting.* Where the time of meeting of a board is by the statute made subject to the direction of the members, when they all meet, there can be no doubt of⸢the legality of the meeting.

*Inspectors of state prison : Rules and regulations : Record: Evidence.* Under the statutory regulations (*Comp. L., 1871*, §§ *8058-9*) relative to meetings of the board of inspectors of the state prison, and the adoption by them of rules and

regulations for the direction and government of the officers, the clerk being made a mere amanuensis, whose attendance is not requisite to make valid the acts of the board, copies of the inspectors' rules, verified by the signature of the inspectors, are sufficiently signed, without the signature of the clerk, to make them a record, and admissible in evidence as such.

*State prison: Inspectors' rules: Printed copies: Record.* Printed copies of such rules pasted in the record book of the board, and signed by each member of the board, are held sufficiently verified as to the correctness of the copies.

*Official bonds: Clerk of state prison: Sureties ; Official duties.* The statutes and the lawful rules of the inspectors are the measure of the official liability of the clerk of the state prison for which his sureties are bound, and it reaches nothing beyond what would come within a fair construction of each.

*State prison: Agent: Prison funds: Statutory powers: Clerk: Official duties.* The statutes expressly vest all control and use of the prison moneys in the agent, and he cannot be relieved from his responsibility, nor can any of his statutory powers be transferred to the clerk; and if the agent allows the clerk to receive and pay out the prison funds, out of his presence and personal control,. it cannot be officially as clerk, but as the agent's own servant.

*State prison: Inspectors' rules: Agent: Statutory duties: Clerk: Prison funds.* The inspectors cannot, by their rules and regulations, impose upon the clerk any duties which will allow him as such to do any part of the agent's responsible work that involves discretion or requires security; and there is nothing in any of their rules which authorizes the clerk to handle or keep or pay over any money.

*Official bonds: Clerk of state prison: Embezzlement: Declaration : Dishonesty.* The inquiry of how far the clerk's bond was intended as a guaranty against dishonesty or peculations, where his office may have given him opportunity to steal, by propinquity to others who had charge of the funds, is outside of the declaration in this case, which is confined purely to embezzlement.

*Clerk of state prison : Official bond : Embezzlement : Falsifying accounts : Declaration.* In an action the whole gist of which is the alleged embezzlement of' prison funds by the clerk as their lawful custodian, the question of his liability for falsifying accounts, from whatever wrong motive, as a distinct ground of action, is outside the issue.

*Requests to charge.* The practice of preferring long and confused requests to charge, which involve elaborate arguments, not calculated to keep the supposed points distinct or intelligible, is criticised; and it is suggested that it would have been difficult to sustain some of the speeches presented as requests in this case, as proper charges on any theory of the case.

*Heard January 21. Decided February 26.*

Error to Jackson Circuit.

*Conely & Sharp* and *Austin Blair,* for plaintiffs in error.

*Isaac Marston, Attorney General,* and *W. K. Gibson,* for defendants in error.

CAMPBELL, J.

Hulin and the other plaintiffs in error, who were his,

sureties, were sued on his official bond as clerk of the state prison, for alleged frauds and peculations.

Two preliminary questions were presented: *First*, whether the bond should not have been prosecuted by the agent of the state prison; and *second*, whether certain rules of the prison inspectors, supposed to have an important bearing on the case, were legally proved.

The agent and clerk are required to give bonds "to the people of the state," the former in twenty thousand dollars, and the. latter in five thousand dollars, conditioned for the faithful performance of their duties according to law; said bonds to be approved by the inspectors, and filed in the office of the auditor general.—*Comp. L.*, § *8069*.

*Section 8072* is as follows: "All the transactions and dealings on account of said prison shall be conducted by and in the name of the agent, who shall be capable in law of suing and being sued in all courts and places, and in all matters concerning the said prison, by his name of office; and by that name he is hereby authorized to sue for and recover all sums of money, or any property, due from any person to any former agent of the said prison, or to the people of this state on account of said prison."

While this language · is broad, yet it contains no reference to prosecutions upon bonds required by law to be filed in another state officer's custody, with no provision of law declaring that the agent may demand them of the auditor general. It cannot be claimed, of course, that the agent could control his own bond, which is made in the same form as the clerk's, and there are some joint duties required of agent and clerk, which might favor collusion in acts which would create breaches of such bonds. It is only "money" and "property" for which the agent can sue, unless on account of prison dealings, and the breach of these official bonds might be for many kinds of misconduct, the action for which could not be in any direct sense a suit to recover either. We think the statute requiring the bonds to be made to the people, and filed with the

auditor general, indicates an intention to keep them separate from those matters which are confided to the agent. Otherwise there is no reason why the clerk's bond should not be filed at Jackson. And it is not. to be presumed it was ever meant that it should be within control of a person who might have occasion to cover up the conduct to be complained of, as affecting both of them. The law does not presume that any one will violate his duty, but it assumes that security is needed against any possible misconduct; and where two officers are required to concur in certifying to some important accounts, it would need strong and undoubted expression to justify a conclusion that one of them was to have exclusive charge of prosecutions against the other, which might depend on that very accounting.

Whatever authority the agent may have to sue for money or property, we think this official bond has not been placed under his control, and that the suit was properly brought by the people though the attorney general.

The rules of the inspectors were proved by a printed copy pasted in a book (which we must presume was the record book of the board), and the signatures of the inspectors were appended in their own handwriting, but there was no clerk's signature. It is claimed the proceedings to adopt them, and the rules themselves, should have been formally recorded, and verified by the clerk.

The statutes on this subject are as follows:

"( § 8058 ). The board of inspectors shall keep regular minutes of their meetings and proceedings, which shall be signed by them, and kept in the prison office.

"( § 8059 ). It shall be the duty of the board of inspectors to meet at the prison once in each month, and then to inspect the same; and a majority shall constitute a quorum for the transaction of business. They shall adopt rules and regulations for the direction and government of all the officers of the prison; and all rules and regulations adopted by them, and their proceedings as a board at each

meeting, shall be recorded by the clerk of the prison, who shall attend their meetings for that purpose."

It is to be observed that the time of meeting is subject to the direction of the inspectors, and when all of them meet, there can be no doubt of the legality of the meeting. The clerk is not made a member of the board, and a record of their proceedings signed by him, and not by them, would be a nullity. It is the signatures of the inspectors, and not his, that give them validity. He is merely their amanuensis, and it cannot fairly be assumed that his attendance would be necessary to make their acts valid, or that his absence would vitiate them. Unless the fact that these rules are printed and pasted in, affects their character as a record, they are sufficiently signed to make them so.

While the practice is not without danger of substitution in some cases, yet it is not so uncommon as to authorize its absolute condemnation. The danger is somewhat theoretical, and cannot often arise. In the present case, where the members of the board all signed the printed paper, it was fully as safe as any manuscript could have been, and probably more legible. And inasmuch as a printed copy was required to be furnished to every officer and guard (§ *8060*), the correctness of the copies was most effectually secured by printing the original.

We think the rules were sufficiently proven.

The principal controversy in the case turns upon the question whether certain moneys were in the official custody of the clerk. The argument and the charges covered a wide field, and presented some considerations which require a careful examination of the record, to determine the true extent of the controversy.

The amended declaration contains two assignments of breaches of the bond. The second is, that Hulin "had in his possession, custody and control, as such clerk, as aforesaid, * * the sum of ten thousand dollars of the

moneys and property of the said plaintiffs, and received as such clerk as aforesaid," and converted it to his own use.

The first, which is set forth more at length, charges him with having received and held in his official custody and control as such clerk, divers sums of money, amounting in all to the sum of ten thousand dollars, which were by him received as such clerk from the state, and from divers persons for the state, and that "the said moneys having been received as aforesaid by said John W. Hulin, and being and remaining in his official custody and control as such clerk, he neglected, wilfully omitted and refused, at the time said several moneys were so received or expended by him as such clerk, * * to enter and keep a true statement of the same on the account books of said prison, or to account for and pay over the same," or to render with the agent annually a true account of such moneys; but, on the contrary, that "he fraudulently converted said moneys to his own use, and made false and fraudulent entries in the books of account of said state prison, of the said moneys of said prison so received by him into his possession and official custody," and prepared false vouchers, and made false annual statements, "all which said false and fraudulent entries, statements and returns, so made by the said John W. Hulin, were made with the intent and design to cheat and defraud the said state of Michigan and said state prison of said moneys, and to conceal from the auditor general of said state, the board of inspectors and agent of said state prison, the fraudulent conversion of said moneys by him, said John W. Hulin, as aforesaid."

The charges are the same in both assignments, that he received and held the money of the prison in his official custody and control, and converted it to his own use, concealing the conversion by false entries and vouchers. He is not charged with taking money which was not in his lawful control, or with making false entries, vouchers or statements in regard to any matter, except as to the moneys which belonged to his official custody.

The theory of the declaration is set out as follows: "For that whereas, by virtue of such office and employment, it became and was the duty, of said John W. Hulin to act as the financial assistant of the agent of said state prison, and to collect, receive and take into his possession moneys belonging to and owing to said state prison, and of moneys paid out on account thereof, and to make proper entries and accounts thereof in the account books of said prison, and to take and file proper vouchers of disbursements made by him on account of said prison, and to enter upon said account books correct accounts of all moneys received by the agent of said prison, by him, said Hulin," etc.

The ground of recovery, under these allegations, was for money which he claimed to have paid out, where the vouchers were made largely in excess of what he had actually paid out; and for money collected and not entered on the books; and there was evidence tending to make out such a case.

The main controversy turns upon whether the functions performed by the clerk, as shown by the proofs, were a part of his official duty. The inquiry, how far the clerk's bond was intended as a guaranty against dishonesty or peculations, where his office may have given him opportunity to steal, by propinquity to others who had charge of funds, is outside of the declaration, which is confined purely to embezzlement. And we are compelled to examine into the statutes, and such regulations as may have been lawfully made under them, to ascertain whether the dealings of the clerk with the prison funds were in the course of his duty as such officer. And as the agent and clerk are the only officers concerning whom any difficulty has arisen in this case, it will be important to consider how far they are affected by the statutes.

The clerk and agent are appointed by different persons. The agent is appointed for two years by the governor and senate, but is removable by the governor.—§ *8052.* The clerk is appointed by the board of inspectors, and holds

31 MICH.—42.

during their pleasure.—§ *8053.* The deputy keeper and assistant keepers are appointed by the agent, with the assent of the inspectors, and removable at the pleasure of the inspectors.

The clerk is therefore independent of the agent under the statutes, and the agent has no voice in his selection; while the latter selects all the deputy and assistant keepers, he being made the principal keeper.—§ *8051.* The law requires one deputy keeper, but the number of assistant keepers is fixed by the joint action of the agent and inspectors.

There is no precise statutory enumeration of the duties of clerk. He is recording officer of the inspectors (§ *8059*), and book-keeping duties of some kind are inferable from the requirement that the annual statement to the auditor general is to be verified by both clerk and agent, to the best of their knowledge and belief.—§ *8083.* The inspectors have duties of examination and reporting, which would involve the need of clerical aid, and all contracts are made under their direction and approval.—§§ *8054, 8055, 8056, 8058, 8059, 8063, 8074-5-6, 8115.* It is evident there are non-enumerated duties, which were to be regulated by the rules of the inspectors, which they are required to adopt *"for the direction and government of all the officers of the prison."*—§ *8059.* How far the inspectors could go in this way, must depend somewhat on the nature of the duties, and the provision made for their performance, if any, by statute.

The duties actually thrown upon the clerk in this case, as shown by the testimony of the agent, included an unlimited authority to collect and receive *all* the moneys coming to the prison from any source, and the entire expenditure of the funds, without any check or limit. Where the agent acted, as he seems to have done occasionally, he accounted to the clerk, instead of the clerk to him, and no practical oversight was exercised over the latter, who was regarded as the person entitled and bound to manage the

entire financial receipts and payments. He made out the bills and collected the moneys due from contractors for labor, and from the United States for the government convicts, and handled all the state money. He paid all the bills for current expenses, and made the monthly statements of receipts and expenditures, took and held the vouchers, and made all the entries, and the agent and board got their knowledge of these from his books and statements. All of the funds remained in his custody, and subject to his disposal. The entire defalcation arose from this practice.

The statute fixes the penalty of the clerk's bond, as well as that of the agent. The inspectors could not increase either of them. If this practice was lawful, the clerk's authority to receive and pay out money required the same security as the agent's, and a bond of only five thousand dollars, from a person to be entrusted with such large sums and such broad authority, would be absurdly small. It is impossible that it could have been supposed that the inspectors would ever grant such powers. This is not conclusive, but it is a consideration not to be overlooked in ascertaining the meaning of the statute authorizing the inspectors to define the duties of officers. For while no one could reasonably be supposed to expect such a startling degree of recklessness as the evidence shows existed here, in practically exercising no oversight worth mentioning over this clerk's transactions, yet a person having any large control of receipts and expenditures might embezzle considerable sums and conceal his defaults under any supervision. The same reasons require the rules themselves to be interpreted with caution.

The statute, by placing the appointment and removal of the agent and clerk in different hands, and by requiring the annual accounts to be certified by both, to the best of their knowledge and belief, excludes the right to put the clerk under any relations which would destroy the value of the check thus created. The deputies of the agent are all

to be selected by himself, and would fairly represent the agent's authority by direct subordination. But it never was intended that any part of the clerk's powers should depend on the will of the agent, and the language of the statute will bear no such interpretation. The inspectors are authorized to adopt rules and regulations,—not to leave that power to the agent; and the official duty of the clerk, so far as such rules are valid, must be so defined by the rules, that his rights and powers shall be apparent. The statutes and the lawful rules are the measure of his official liability for which his sureties are bound, and it reaches nothing beyond what would come within a fair construction of each.

The duties of the agent are very fully defined by law, so as to leave little room for rules concerning his actions, which would go beyond mere regulations. Apart from his police duties, he has very ample financial powers, which must to some extent, if not entirely, be exclusive. Although the contracts are subject to the approval of the inspectors, the agent is required to "superintend the manufacturing and mechanical business that may be carried on pursuant to law within the prison; to receive the articles manufactured, and to sell and dispose of the same for the benefit of the state; and to take charge of all the real and personal property attached to the prison."—§ *8071.* He is to transact all business and dealings, and sue for and recover all money and property due to the prison.—§ *8072.* He is to make all purchases under the direction of the inspectors, and pay for them.—§§ *8078-9.* He is "to keep a regular and correct account of all moneys received by him from every source by virtue of his office, including all money taken from convicts, or received as the proceeds of property taken from them, and of all sums paid by him, and the persons to whom and the purposes for which the same were paid, and to make out and deliver to the inspectors monthly, *on oath,* a return of all moneys received and paid by him on account of the prison during the preceding month,

specifying from whom received, and to whom paid, and on' what account, and stating also the balance in his hands at the time of rendering such account."—§ *8081.*

A full statement of these monthly returns, *verified by the agent,* is to be sent by the inspectors to the secretary of state on or before the first of January in each year (§ *8063*), accompanied by certain other matters. An annual accounting is to be made by the agent in November, and on or before the 15th of December he is required to fur- nish to the auditor general a full account of receipts and expenditures, with vouchers, and an inventory and complete business statement, and to these documents transmitted to the auditor is to be annexed an affidavit of the agent and clerk, "stating that the same are true' in every respect according to the best of their knowledge and belief."—§§ *8082–3.* The agent is to make a similar annual report to the inspectors by the first of December. By § *8114* the deputy keeper is also mentioned in this connection. It is made "the duty of the agent and deputy keeper to see that rigid economy is practiced in all matters pertaining to the prison, and in the employment of prisoners, and that du- plicate receipts be taken for all expenditures made by them on account of the prison, one copy of which shall be sent to the auditor general's office monthly."

No one can read these provisions without seeing that the law intends that every dollar of revenue shall be received and paid out by the agent, so that he can make oath to it. If any one else is to pay out money, the deputy keeper is the only one named, and a deputy chosen by the agent is his representative, as far as such power extends. The only reference to the clerk is for a joint affidavit, not on knowl- edge, but on knowledge and belief, as to the state of accounts which have been furnished to the inspectors, whose record he keeps,—not only monthly on the agent's oath, but by a recent annual sworn statement; and the clerk's duties, as indicated by the statute in this respect, evidently refer to the harmony of the report to the auditor with such infor--

mation as the clerk possesses. The agent's monthly reports are to be on oath, without the belief clause which appears in the section requiring the joint oath.

If this statutory policy should be adhered to, the clerk could commit few frauds, except in covering the fraud of the agent, but could easily do that; and a bond might very well be needed · to secure fidelity in this respect, as well as care and accuracy in his other duties. The agent's bond for twenty thousand dollars, was the main reliance for the safety of the funds.

If authority could be vested in the clerk, to receive and disburse money separately, as was assumed in this case, he being an independent officer, and not the agent's appointed deputy, there. is no principle which could hold the agent responsible for the clerk's acts of which he is ignorant. And if he left the business completely in the clerk's hands (as he did here), it would take it from the hands of a responsible officer with substantial bonds, and leave it se-cured by a bond so small as to be merely nominal, com-pared with the funds involved; and would substitute an inferior officer, selected and removable by the inspectors, for the superior one, appointed by the governor and senate, and only removable by the governor.

Any such construction of the law is forced and dan-gerous. The agent cannot lawfully be relieved from his responsibility, and none of his statutory powers can be transferred to the clerk. Whatever assistance the latter may be directed to render to the agent, must exclude any right or duty of controlling or receiving the prison funds. If the agent allows him to receive and pay out money, out of his presence and personal control, it cannot be officially as clerk of the prison, but as the agent's own servant. There is no ambiguity whatever in the statutory provisions vest-ing all control and use of the moneys in the agent. Not a dollar can ever be lawfully received or paid out by the clerk in his own official capacity, independent of the agent.

The rules of the inspectors appear in some respects to

trench upon the statutes, by indicating that the clerk is not only to act "as assistant to the agent in the discharge of his financial duties," but to keep all the financial accounts, and have the custody of all the books and papers, and make all the monthly and other statements and reports of financial matters, concerning which the statutes are clear and positive.

There is nothing, however, in any of the rules, which authorizes the clerk to handle, or keep, or pay over any money; and, except in regard to the exclusive custody of books and papers, some of which are expressly required to be in the hands of the agent or his deputy, they may, perhaps, be construed as intending to put him in the place of a book-keeper who has no right to touch the funds. This is a proper function of a clerk, and we see no reason why such duties may not be authorized, so far as they do not diminish or affect the agent's rights and duties. But no duties can be laid upon the clerk, which will allow him as such to do any part of the agent's responsible work that involves discretion or requires security.

If this record presented the question of liability for falsifying accounts, from whatever wrong motive, as a distinct ground of action, the questions which were argued outside of the record might become important, and would require notice. But the whole gist of this action being the alleged embezzlement of money by its lawful custodian, no such point arises.

Although the points supposed to arise were such as should have been presented in brief and plain terms, the requests to charge were in several instances very long and confused, and involved elaborate arguments not calculated to keep the supposed points distinct or intelligible. The practice is not proper, and it might have been difficult to sustain some of these speeches as proper charges on any theory of the case. The charges given by the court of its own motion were free from such complications, and it would

have been very much better if all the legal propositions on which special 'charges were sought had been stated briefly, as they were, for the most part, in the charges asked by counsel for the defendants below.

The judgment must be reversed, with costs, and a new trial granted.

GRAVES, CH. J., and COOLEY, J., concurred.

CHRISTIANCY, J., did not sit in this case.