# CASES DETERMINED

AT THE

## *August Term, 1877.*

## OLSON VS. MERRILL.

NAVIGABLE RIVERS.  *(1) Rights of riparian owner to the bed.  (2, 3) What streams considered navigable.  (4) Plaintiff's right to navigation not affected by his own tort.*

1. Under the uniform decisions of this court, one who owns both banks of a stream, navigable or unnavigable, has title to the bed of the stream. [A suggestion by DIXON, C. J., in *Wis. R. I. Co. v. Lyons*, 30 Wis., 61, and in *Wright v. Day*, 33 id., 260, as to the effect of certain federal decisions on the subject, criticised.]

2. It is the settled law of this state, that streams of sufficient capacity to float logs to market are navigable; and it is not essential to the public easement that this capacity be continuous throughout the year, but it is sufficient that the stream have periods of navigable capacity ordinarily recurring from year to year, and continuing long enough to make it useful as a highway.

3. If the capacity of a stream is such that it can be used as a highway without any trespass upon the banks, the right of the public therein is not affected by the fact that such trespass is convenient and habitual.

4. The right of A. to float his logs down a navigable stream, unimpeded by the dam of B., is not affected by the unlawfulness of A.'s dam on the same stream.

APPEAL from the Circuit Court for *Jackson* County.

Action for damages alleged to have been sustained by the plaintiff by reason of defendant's obstructing the waters of Levis creek by a dam therein about six miles above the

mouth of the creek, and thus preventing plaintiff from float-ing logs, from a point about two miles higher up said creek, to his mill at the mouth thereof.   The complaint alleges that the owners of the mill at the mouth of Levis creek (which had been in existence since 1843) always depended upon said creek for logs to supply their mills; that such logs were cut in the winter time, hauled to said creek, and, upon the usual spring rises of water in the same, were floated and driven down to said mill; that saw-logs had been so cut, hauled, floated and driven down said creek from points at least as high up as defendant's dam here complained of, for over twelve years; that said creek was a navigable highway for the passage of saw-logs from said mill to points higher up than defend-ant's said dam, for at least five years; and that, during the spring and fall seasons of each year from 1869 to 1872, inclu-sive, plaintiff drove his logs down said creek without hind-rance, from points three and a half miles above said dam. The complaint further alleges that, by reason of defendant's so obstructing plaintiff in the use of his said property, and in the carrying on of his business in the manufacture of lumber at his said mill, plaintiff has sustained damages in the sum of $2,000, for which judgment is demanded.   The answer was a general denial.

On the trial, plaintiff introduced evidence to prove the averments of the complaint.   In respect to the navigability of Levis creek, at and above the place of the alleged obstruc-tion, the evidence tended to show that the creek had been profitably used for floating logs to mills below, in 1863, and nearly or quite every year since that date; that it could not be so used at a low stage, or even an ordinary stage, of water, but only during certain "rises," which usually occurred, to the number of three or four each year, in the spring and summer, such rises varying in duration from four to thirteen days.   In respect to the manner in which logs were run on said creek, the evidence in plaintiff's behalf was substantially

as follows. As a witness in his own behalf, plaintiff testified, upon his cross examination: "We had tools for driving, and when the logs jammed, we had to break the jam. They will always jam in a narrow creek. They jammed a good deal there. Q. Were you not compelled to go along the bank and work those logs down the best way you could? A. Yes. Q. Wasn't there a good deal of labor to keep the creek in shape so that the logs could be got down? A. In places it was a good deal of work, and in places it went straight along. Q. Wasn't it necessary to go along with these logs, and keep the creek open for the purpose of getting them down. A. Yes. If it is a low rise, it is more work to move them than in good water. Q. It requires constant labor on the creek to get the logs to run during the running seasons? A. Yes." In reply to his own counsel, he stated that it "takes a driving crew to drive logs on all the upper streams." Another witness said: "On all these streams it requires a crew of men to follow up and keep the logs in the current, and to work them over sand-bars, and keep them in motion." "Olson has had to work to get his logs down. They could not run themselves; you have to punch them." Another: "I have driven on several creeks here, and I never drove anywhere but that I had to use a hand-spike." "After we got them into the creek, we generally had men on each side of the creek, and wherever we found out there was a bad point, we had a man stationed there with a handspike, and as they came down he would turn them off. The creek is very crooked, and has short bends, and it required a good deal of labor to get the logs down." Another stated that, "in a fair spring rise, logs would run a little way at a time, and we would have to punch them along until we got them down.....Sometimes the logs ran easily on the creek, and sometimes they would stick, and we had to help them along." Being asked, on his cross examination, "How do you succeed in navigating it when at a proper stage," he answered: "We generally have a crew of men, and have tools, and get the logs

out of the jams, and keep the banks clear, and take out the stumps and trees so as to keep the river clear." In response to plaintiff's counsel, he said that running logs in Black river also "requires men to go along the bank, and make the drive." Being asked, on cross examination, whether, in a right state of water on Black river, logs could not be "put in and floated down alone," he said: "It would not take so much assistance; I don't think they could go clear down alone; a few would, but you would have to assist some. In a good stage of water they would go for miles without help." Another witness, on his cross examination, testified as follows: "Q. Take as good a condition of water as you can get, how do you have to navigate it then? A. Have to drive with a handspike, and have men stationed along on the side to help the logs down." In answer to plaintiff's counsel, he testified that he "had seen drives on other streams;" that "they always have to have drivers;" and that "it is necessary to have men accompanying the logs on all these streams."

It did not appear that Levis creek was used for driving logs prior to 1863. One of plaintiff's witnesses stated, on his cross examination, that not a great many logs were run down in 1863. "Q. What was the trouble?. A. The trees were not all cut out. Q. It was not navigable so that logs could be got down? A. Not the whole way up." In response to plaintiff's counsel, he testified as follows: "Q. You spoke about the first drive in 1863, that they could not get the logs all down? A. They would have to clear the creek out before they would come down. Trees would fall into the stream, and would have to be cut out." Another witness, on cross examination, speaking of the drive in 1863, said: "They worked along with the logs, and whenever they came to where they had to take something out of the river, they took it out. That is the first time they ever cleaned the creek out." Another witness, speaking of the same year, stated that he "cleared out the creek, and helped to start the drive." "Q.

What clearing did you have to do? A. We cut out trees, and made some cut-offs, and took out some trees that had formed islands; and there were alders growing there, which we took out. The drive we made that year did not exceed 100,000 feet." Afterwards, in answer to a general question, whether this creek was navigable for the purpose of running out logs in a fair rise of water in the spring, he answered: "It was not the first year; not until after we cut out the trees; it grows better every year, and the stream grows wider." On his cross examination, he testified as follows: "In 1863, before the logs were driven, there was brush across the creek, and alders on each side, and it had formed alder tow-heads. Without the improvement that was put on, we could not have run a log down. I suppose that *Mr. Merrill* and I put on most of the improvements that have rendered it fit for navigation. I don't know but Mr. Levis, to whose mill we ran logs in 1863 or 1864, might have had a man on the creek to make improvements. *Mr. Olson* has put on improvements since he went there. We could not drive logs anywhere on the creek without clearing it. In 1863, we cleared down to the Black River Iron Company's ford, where *Merrill* and I built a mill in 1865." [This ford was below the dam here complained of.] The witness further testified that he and *Merrill* cleared the creek out so as to render it navigable, for the benefit of their mill; that before that work was done, it was not navigable; that above defendant's dam, " you could not see any creek, on account of the brush and alders;" that it was not in any shape for navigation, and everybody said he was crazy to commence on such a stream, and he never made much profit out of it. In response to plaintiff's counsel, the same witness, speaking of the drive of 1863, stated that the trees that had fallen into the stream, and the alders that were growing up, had to be cut out; and some cuts had to be made, as a sixteen-foot log would not swing around in some places unless there was a cut made.

It was admitted that the stream was not meandered.

On his direct examination, plaintiff testified that he had a mill at the mouth of Levis creek, worth about $4,000; and that he had pine lands on the upper waters of that creek, and got his logs from the creek. On cross examination, he stated, in reference to the logs alleged to have been detained by defendant's dam: "I wanted to run these logs to my mill for the purpose of sawing them — for the sole purpose of manufacturing them, and then running the lumber and selling it. My sole object was to stock my mill with lumber." One of defendant's witnesses, having testified that there was a dam at plaintiff's mill, was asked how high that dam was; but the evidence was rejected as immaterial.

It appeared that defendant owned the land on both sides of Levis creek where his dam was constructed.

No exceptions were taken to the instructions given by the court. The jury found that Levis creek was a navigable stream, and also found generally for the plaintiff, in the sum of $1,013.51. Defendant moved for a new trial, on the ground that the verdict was not warranted by the evidence; and, that motion being denied, he appealed from a judgment on the verdict.

The cause was submitted for the appellant on the brief of *Carl C. Pope.* He contended, 1. That it was error to reject evidence of the character of the plaintiff's dam across Levis creek; that the action was brought to recover damages sustained by the plaintiff in the manufacture of lumber at his mill; that it clearly appeared from the evidence that plaintiff desired to navigate the creek for the sole purpose of supplying that mill with logs; that the gist of the action was, that defendant's dam injured the plaintiff by lessening the profits which the latter would otherwise derive from the full enjoyment of his own mill; and that if it should appear that plaintiff's dam, without which his mill was valueless, was itself an unlawful obstruction of the public easement, he could

not recover for a mere injury to the full enjoyment of such unlawful obstruction. 1 Hilliard on Torts, 138, 161–163; *Lord v. Chadbourne*, 42 Me., 429; *Sherman v. Fall River I. W. Co.*, 5 Allen, 213; 4 Cush., 326. 2. That a verdict should be set aside where there is no sufficient evidence to support it (*Smith v. Wallace*, 25 Wis., 55; *Vilas v. Mason*, id., 310; *Paine v. Roberts*, 29 id., 642; *Janssen v. Lammers*, id., 88); and that, upon the evidence of the plaintiff's own witnesses, it was clear that Levis creek is not in any legal sense a navigable stream. *Brown v. Chadbourne*, 31 Me., 9; *Treat v. Lord*, 42 id., 552; 50 id., 479; *Rowe v. Granite Bridge Co.*, 21 Pick., 344; *Morgan v. King*, 35 N. Y., 454; *Munson v. Hungerford*, 6 Barb., 265; *Curtis v. Keesler*, 14 id., 511; 35 id., 9; *Rhodes v. Otis*, 33 Ala., 578; *Hickok v. Hine*, 23 Ohio St., 523; *Hubbard v. Bell*, 54 Ill., 110; *Weise v. Smith*, 3 Oregon, 445; *The Montello*, 20 Wall., 430; 5 Am. R., 98, 108–9, and notes; 13 id., 258, 262, and note; *Whisler v. Wilkinson*, 22 Wis., 572.

For the respondent, a brief was filed by *Gregory & Pinney*, and the cause was argued orally by *Mr. Pinney*. They argued, 1. That the greater portion of the valuable pine timber in this state is situated along streams like Levis creek, and such of this timber as annually finds its way to market, is floated through the windings of such streams, men being stationed at difficult points to break jams, and push logs off the banks, rocks or bars; that, in the application of legal principles to the actual condition and necessities of the great lumbering interests of this state, the right asserted by the plaintiff is one of great importance; that, in determining the question here, reference should be had to the decisions of the courts of those states where rights of that character are of like importance, and where we may infer that the cases have been carefully considered; that it has been held by the courts, without any considerable dissent, that the public have a right of way in every stream which is capable, in its natural state and in its

ordinary volume of water, of transporting, in a condition fit
for market, the products of the forest or mines or of the till-
age of the soil upon its banks, and that such capacity need
not be continuous, but if the stream is ordinarily subject to
regular periodical fluctuations, from natural causes, and con-
tinuing sufficiently long to make it useful as a public high-
way, it is subject to the public easement (*Morgan v. King,*
35 N. Y., 454, 459); that this rule has been extended in nearly
all the states so as to embrace streams upon which, in their
natural state, there is a capacity for valuable floatage, irre-
spective of the fact of actual public use, or the extent of such
use; and that the true test for determining the right of pub-
lic use is, whether the stream is inherently and in its nature
capable of being used for the purposes of commerce, for the
floating of vessels, boats, rafts or *logs. Moore v. Sanborne,*
2 Mich., 519, 523, 528; *Brown v. Chadbourne,* 31 Me., 9–24;
*Hickock v. Hine,* 23 Ohio St., 527. And the public right ex-
ists notwithstanding it may be necessary for persons floating
logs on the stream to use its banks. *Brown v. Chadbourne,*
*supra; Treat v. Lord,* 42 Me., 552, 561, 565; *Knox v. Chal-
oner,* id., 150; *Veazie v. Dwinel,* 50 id., 484, 487. 2. That
as it was not pretended that defendant's rights had been in
any way invaded or impaired by the maintenance of plaint-
iff's dam, the question whether that dam was an obstruction
to the free use of the creek, was immaterial in this case.

RYAN, C. J.    I. Whether the stream in this case be in fact
navigable or not, the title to the bed of the stream is in the
appellant, as owner of both banks.    This has been the uniform
rule of decision in this state from the beginning. *Jones v.
Pettibone,* 2 Wis., 308; *Walker v. Shepardson,* 4 id., 486;
*Mariner v. Schulte,* 13 id., 692; *Arnold v. Elmore,* 16 id.,
509; *Yates v. Judd,* 18 id., 118; and other cases.

It is true that, in delivering the judgment of the court in
*Wis. R. I. Co. v. Lyons,* 30 Wis., 61, DIXON, C. J., suggests

that the rule established in *Jones v. Pettibone*, as applied to navigable rivers, was authoritatively overruled by *Railroad Co. v. Schurmeir*, 7 Wall., 272; and perhaps he intimates the same thing in *Wright v. Day*, 33 Wis., 260. It is also true that the view is expressed by the learned judge who delivered the opinion in *Railroad Co. v. Schurmeir*, and again by the learned judge who delivered the opinion in *Yates v. Milwaukee*, 10 Wall., 497, that riparian owners upon navigable streams take no title in the bed of the stream. But it is a little remarkable that the riparian owner's title in the bed of the stream was not involved in the judgment of the court either in *Railroad Co. v. Schurmeir*, or in *Yates v. Milwaukee*, or in *Wis. R. I. Co. v. Lyons*, or in *Wright v. Day*.

And, with great respect, we cannot but think that the chief justice's doubts arose from perhaps too strained and implicit a deference of that very able jurist to federal authority in state matters. None of the present members of this court share in those doubts. And, with all the deference to the authority of the federal supreme court which all state courts are bound to entertain, we should be inclined to adhere to the settled rule in this state, even if that court had left us in doubt on the subject.

But in the late case of *Barney v. Keokuk*, 4 Otto, 324, the true rule of jurisdiction on the subject is undoubtedly established by that court. The case arose in Iowa, and involved the title of the riparian owner to the bed of a navigable stream. The court quotes and follows the decisions of the supreme court of that state, against the title of the riparian owner in the bed of the stream. And, speaking of the confusion of navigable with tide water, in this country, it says: "It laid the foundation in many states of doctrines with regard to the ownership of the soil in navigable waters above tide water, at variance with sound principles of public policy. Whether, as a rule of property, it would now be safe to change these doctrines where they have been applied, as before remarked, it is

for the several states themselves to determine.   If they choose
to resign to the riparian proprietor rights which properly be-
long to them in their sovereign capacity, it is not for others
to raise objections."

This view, so far as may have been necessary, leaves this
court free to adhere to a doctrine almost as old as the state,
and which it would now be very mischievous to disturb.   And,
as to its policy, we may be permitted to remark that we con-
sider the wisdom of the rule of this court amply vindicated in
the very able exposition of the question in *S. B. Magnolia v.
Marshall*, 39 Miss., 109.

The right of the appellant, therefore, to erect and maintain
his dam, so far as this case presents it, rests solely on the ques-
tion whether the stream was navigable in fact or not.

II. It is not denied that the court below fairly submitted to
the jury the question whether the stream was navigable in fact
or not.   And the only question here is, whether there was
sufficient evidence to go to the jury and to support the verdict.

It is settled in this court, that streams of sufficient capacity
to float logs to market are navigable.   *Whisler v. Wilkinson*,
22 Wis., 572; *Sellers v. Union L. Co.*, 39 id., 525.   And we
deem it essential to the public interest in the pine-growing
regions of the state, spoken of in *Whisler v. Wilkinson*, to
adopt the rule collected from the authorities in Angell on
Watercourses, § 537, and substantially adopted in the charge
of the court below:   "Nor is it essential to the public ease-
ment that the capacity of the stream, as above defined, should
be continuous; or, in other words, that its ordinary state, at
all seasons of the year, should be such as to make it navigable.
If it is ordinarily subject to periodical fluctuations in the vol-
ume and height of its water, attributable to natural causes,
and recurring as regularly as the seasons, and if its periods of
high water or navigable capacity ordinarily continue a suffi-
cient length of time to make it useful as a highway, it is sub-
ject to the public easement."

Olson vs. Merrill.

There is ample testimony in the bill of exceptions tending to show that this was the character of the stream in question; and that it had been successfully and advantageously used for years for the purpose of floating logs to market.

The particular objection, however, to the stream in question is, that, at some particular points in its course, it has not sufficient capacity to float logs without manual aid from the shore; in other words, that it can be made practically navigable only by trespass on the banks. And this objection appears to be sustained by *Brown v. Chadbourne*, 31 Me., 9; *Treat v. Lord*, 42 id., 552; and other cases following them.

We are not, however, inclined fully to follow that class of cases. We of course recognize the position that the navigable character of a stream cannot depend upon trespass on the shore; and that one floating his property down a stream has no right, without license, to use the banks of the stream to aid him. But it appears to us to be begging the question to assume that, because it is convenient, and persons are accustomed so to use the banks, therefore the stream is not navigable without trespass upon them. We take it that a stream which is of sufficient capacity to float logs, is of sufficient capacity to float some kind of boat or skiff, in which the owner may follow his logs. And if there be some places where, in consequence of bars or other obstructions, neither logs nor boat will pass without human help, the boat may be aided down the stream as well as the logs; so that the logs may be floated through the stream without trespass on the banks. This might probably be inconvenient, and even sometimes dangerous. But a stream is none the less navigable because persons using it are induced by convenience to prefer unlawful to lawful means in aid of the use. Indeed we gather from cases which have come before us, that the same practice prevails on some of the larger streams in this state. But the navigable character of a stream does not rest on the tortious practice, but on the capacity of the stream to be lawfully used. And we cannot hold

that the right to use a public highway, by land or by water, is lost even by habitual trespass upon adjoining lands.

The learned counsel of the appellant cites cases clearly showing that different rules prevail in other states. But we think that we are supported in principle and by authority, in adopting a rule in this state which appears to us to be important to its great lumbering interests.

III. We cannot think that the condition or lawfulness of the respondent's dam went at all to his right to float his logs down the stream where the appellant's dam prevented him. If the stream be navigable, the respondent had the same right to use it, whether he had a dam or mill there or elsewhere, or anywhere. And his right to float his logs is wholly independent of his right to erect or maintain his dam.

We do not consider the question whether the respondent showed a particular injury to himself, not common to the public, sufficient to support the action. The appellant did not make the point, and we therefore take it to be conceded, for the purposes of this case.

*By the Court.* — The judgment of the court below is affirmed.