[No. 10638.  Department Two.  April 8, 1913.]

SUMNER LUMBER & SHINGLE COMPANY, *Respondent*, v.
PACIFIC COAST POWER COMPANY *et al.*, *Appellants*.[1]

NAVIGABLE WATERS—NAVIGABLE OR FLOATABLE STREAMS—EVIDENCE
—SUFFICIENCY. A stream that is navigable or floatable for shingle
bolts only by artificial means, is not a public highway; and a
stream is not navigable where it appears that drives required the
assistance of men and teams in breaking up jams, opening new
channels and keeping bolts from lodging, that no drives had been
made without the use of the banks, and that few if any bolts could
be brought down by natural means.

SAME—RIPARIAN RIGHTS — USE OF WATERS — INJUNCTION. The
right to use a stream for floating logs is correlative with the right of
a power company to use the water for power purposes, and as each
right must be used with due regard to the other, an injunction
against all use of the water cannot be sustained.

SAME—EVIDENCE—MEANDER. The fact that a stream is not me-
andered by the public survey does not establish its character as a
navigable or nonnavigable stream.

WATERS AND WATER COURSES—RIPARIAN RIGHTS—FLOW AND USE.
The use of the waters of a stream for power purposes in no way
infringes upon the rights of one who has acquired the timber on
riparian lands, where such use does not interfere to any extent
with the flow of the water to which the land is entitled.

SAME. A lower riparian proprietor cannot insist that there be no
diminution whatever of the natural flow of the stream, as each own-
er is entitled to a reasonable and proper use.

SAME—APPROPRIATION—PRIORITY. The rights of an appropriator
of water for power purposes relate back to the first substantial act
for the acquisition of the right if followed up with reasonable dili-
gence, and are superior to the rights of an owner of land which
subsequently became riparian by a change in the course of the
stream.

NAVIGABLE WATERS—FLOATABILITY—EVIDENCE. The navigability
of streams for floating shingle bolts is not determined by the size of
the stream, but by their capacity for valuable public use in their
natural condition.

Appeal from a judgment of the superior court for Pierce
county, Card, J., entered May 25, 1912, upon findings in

[1]Reported in 131 Pac. 220.

favor of the plaintiff, after a trial on the merits before the court without a jury, in an action to enjoin a power company from diverting the waters of a river.    Reversed.

*James B. Howe* and *John A. Shackleford*, for appellants.
*E. N. Steele* and *Troy & Sturdevant*, for respondent.

MORRIS, J.—The respondent company operates a shingle mill near the mouth of the Stuck river.  In connection with its mill it maintains a boom, and has included in its boom plat filed with the secretary of state all of the Stuck river, and the White river from its union with the Stuck river up beyond Buckley.  The Pacific Coast Power Company maintains a large electric power plant near Dieringer.  To obtain water for generating this power, it has obtained, through the purchase of riparian lands or the acquirement of water rights, all of the riparian rights (except as to one small piece that will be hereafter referred to) upon the White and Stuck rivers between points near Buckley and Dieringer, a distance of approximately eighteen miles.  At the point near Buckley, the power company has constructed a dam, and by flume and canal conveys the water from its intake to Lake Tapps, which is used as a reservoir for storage of the water for use at such times as the natural flow would prove insufficient for the purpose required.  From Lake Tapps the water is conveyed to the power house, and thence through a tail race it finds its way into the Stuck river.

Prior to the incorporation of the power company, on January 17, 1908, the Tacoma Industrial Company and the White River Power Company had acquired water rights and lands along the White river, and as early as 1903 engineering and construction work had commenced by one or the other of these companies.  At the time of appellant's incorporation, these other companies conveyed all their rights and property to it.  Appellant then proceeded with the development of the power scheme and the construction of its power plant, and up to the time of trial, had expended in

construction work about $5,000,000, the plant being completed in October, 1911. The respondent was incorporated in July, 1908, and began the construction of its mill, which was completed and started operations in October, 1908. In August, 1910, the shingle company purchased the cedar upon a tract of land located some distance above the dam and intake of the power company, under which contract it was bound to remove the cedar within three years. This land is referred to in the record as the St. Paul land. In August, 1911, subsequent to the commencement of this action, the shingle company agreed to purchase from the Northern Pacific Railway forty acres of land on White river, between the dam and intake of the power company and the point where the water is returned to Stuck river. This land is referred to as the Northern Pacific land. When the power company acquired all the riparian rights on these rivers in 1908, this Northern Pacific land was not riparian to either river. Subsequently the White river changed its course, and as a result of such change, about two hundred and fifty feet of this Northern Pacific land now abuts on the river. This action was commenced by the shingle company to enjoin the power company from maintaining its dam and diverting the waters of White river at its intake, alleging that such diversion would destroy the two rivers as a water highway and prevent the shingle company from getting its timber or that of others to its mill, and destroy its business as a booming company. The court below granted such an injunction, and the power company has appealed.

The appeal presents only questions of law, all the material facts being conceded. In determining the respective rights of these parties to the rivers and the use of their waters, the first point to be decided is the character of these two rivers. They are practically one river and will be treated as such. Respondent company made its first drive in September, 1908, since which time it has made fourteen drives from points below appellant's intake and four drives from above

the intake. In order to make these drives, it has expended about $700 in improving the river for driving purposes, in removing boulders and other obstructions, making new channels, and other like work. There is much testimony in the record as to whether it is possible to make a drive without the use of the banks, it being conceded, as we understand it, that such drives could not be made without using the bed of the stream; and while there is no dispute as to the fact that no drive has been made without the use of the banks, the lower court seemed impressed with the opinions of witnesses that it could be done, and found "that in driving shingle bolts down the said rivers to plaintiff's mill, drivers have been accustomed to frequently go upon the banks of the streams above the line of high water mark, but that it is not necessary so to do, although it is necessary in driving on the said streams for the drivers to go upon the bed of the streams." Whether or not a drive could be made without the use of the banks, we are unable to say. We think it is better to take the facts as they appear, rather than the opinions of witnesses given for the purposes of obtaining or defeating relief in litigation. It is clear, however, that it would be impossible to drive these rivers without men and teams assisting in breaking up jams, opening up new channels, and keeping the bolts from lodging on the banks and bars. We not only have the evidence of witnesses as to what was done, but through the medium of about two hundred pictures we have been able to get a fair view of the difficulties encountered and the obstacles overcome in making a drive. It is apparent that, if dependency was had upon the natural condition of these streams, few if any shingle bolts would ever reach respondent's mill. The river is a glacial stream, subject to material variation during each summer day on account of the glacial tide. A chart showing the flow is in the record. From this chart it appears that it is not an unusual thing for the flow to increase or diminish nearly one hundred per cent within a day or two. The result of this intermit-

tent flow is that the bolts are lodged all over the bed of the river, which, on account of numerous past floods and erosions, averages nearly one hundred feet, and requires constant handling to keep them in the drive.

The navigability of streams, or that they possess a capacity for valuable floatage, is a question of fact, and he who asserts it must prove it. To be navigable or floatable in law the stream must possess such characteristic in its natural state. If artificial means or aids are necessary in making use of the stream to float timber, the stream is not floatable. This rule was first announced by this court in *East Hoquiam Boom & Logging Co. v. Neeson*, 20 Wash. 142, 54 Pac. 1001, where it was said:

"It is well settled that a stream which can only be made navigable or floatable by artificial means is not a public highway."

The same rule was announced in *Griffith v. Holman*, 23 Wash. 347, 63 Pac. 239, 83 Am. St. 821, 54 L. R. A. 178. In *Watkins v. Dorris*, 24 Wash. 636, 64 Pac. 840, 54 L. R. A. 199, a new element of floatability was announced, in holding that streams which can, during annually recurring freshets, be used profitably for the floating of logs, must be held to be public highways for such purposes; that while in such streams the title to the beds might be in the riparian owner, such title was subject to an easement in the public to use the stream for floating logs and timber products; and while such use as a public highway could not be denied, the easement was confined to the stream, and neither the banks nor the soil in such a stream as the one then being considered could be used as an aid to floatability without the landowner's consent, or right obtained by operation of law. We next had occasion to rule on this same question in *Monroe Mill Co. v. Menzel*, 35 Wash. 487, 77 Pac. 813, 102 Am. St. 905, 70 L. R. A. 272, and, following *Watkins v. Dorris*, it was held that a stream which in its natural state is capable of floating shingle bolts, after heavy rains and during freshets

which occur with periodic regularity in the spring and fall
of each year without the storage of water by dam, is a navigable stream for the purpose of floating shingle bolts and
other timber products. As determining that such a rule
was in this state one of necessity, it was there said:

"The reasons leading to the holding in this state and
others, where the timber industry is important, that streams
which are navigable in fact for the floatage of timber to market shall be public highways for that purpose, are founded
upon commercial convenience and necessity, because of the
environment of the industry. Much of the timber grows
in the mountains, also upon the foothills, and in other localities which are inaccessible by means of transportation facilities, without great expense. Nature has, however, provided numerous streams which flow out from these timber
centers, and which are available highways for the carriage
of the timber to market. In a locality so situated, it seems
reasonable that these highways should be used for such purposes. It is true, the majority of these streams, being unmeandered, pass over private property, and their beds are owned
by the adjacent land owner. But the lands are naturally
burdened, if it be a burden, by the streams themselves, with
their defined banks and flowing water, and it is not an additional burden to the land owner for the timber product to
float along with the already running water, provided it is
so done as not to damage his land. His rights in the latter
particular must, however, be strictly and carefully guarded.
Under the former decisions of this court, and for the further reasons herein assigned, the court did not err in holding that Wood's creek is a navigable stream for the floatage
of shingle bolts ;"

to which was added later on in the opinion:

"We believe we went as far as we should go in the interest
of public convenience, when we held, in *Watkins v. Dorris*,
*supra*, that private land owners hold the beds of unmeandered streams subject to the easement of driving timber
products over the land. But we tried to make it clear in
that case that the timber driver must confine himself and
his operations to the highway itself—the bed of the stream—
until the land owner consents to the use of the banks or

until the right to their use has been acquired in a lawful manner. If more emphatic statement of that rule is necessary, we now wish to be understood as making it, with all needed emphasis. The fundamental principle of right in the land owner to control his own premises, outside of the bed of the stream, must not be violated."

The navigability of a stream that will float timber products during natural freshets was next determined in *State ex rel. United Tanners Timber Co. v. Superior Court*, 60 Wash. 193, 110 Pac. 1017, and the previous cases followed. It was, however, said in that case, that the fact that the use of the shores added to the convenience of driving the timber did not affect the question of the natural navigable capacity of the stream, quoting from *Olson v. Merrill*, 42 Wis. 203: "A stream is none the less navigable because persons using it are induced by convenience to prefer unlawful to lawful means in aid of the use." That it was not intended to depart from the rule of the prior cases is evident from what is next said: "Where the use of the shore rights is required to facilitate the driving of logs, they must be acquired by private treaty or by condemnation." Our latest statements of the rights as to the banks and beds of these small streams is found in *Berryman v. East Hoquiam Boom & Logging Co.*, 68 Wash. 657, 124 Pac. 130, where it was held that the right to damage riparian lands by splash dams could be acquired by prescription, but if not so acquired, "persons have no right to use or interfere with the beds or banks of a stream without the riparian owner's consent."

From these decisions it can be gathered that the present rule in this state is that a navigable or floatable stream is one that in its natural condition, without artificial means or aids, is susceptible of floating timber products from the forest to the mill, and that streams which are subject to annually occurring freshets of sufficient volume to float logs or shingle bolts are considered floatable in their natural condition, and that as between the riparian owner and the tim-

ber driver, the driver must confine himself to the stream itself, and cannot make use of the banks until the right to such use is obtained by grant, prescription, or eminent domain. That such is the rule in other states, where the law has been moulded to fit natural conditions and necessities as referred to in *Monroe Mill Co. v. Menzel, supra,* is apparent from the following cases: *Carlson v. St. Louis River Dam & Imp. Co.,* 73 Minn. 128, 75 N. W. 1044, 72 Am. St. 610, 41 L. R. A. 371, and note; *Moore v. Sanborne,* 2 Mich. 519, 59 Am. Dec. 209; *Brown v. Chadbourne,* 31 Me. 9, 50 Am. Dec. 641; *Treat v. Lord,* 42 Me. 552, 66 Am. Dec. 298; *Pearson v. Rolfe,* 76 Me. 380; where it is said:

"The log driver takes the waters as they run, and the bed over which they flow as nature provides. Nor has any person the right, unless upon his own land, or under legislative grant, to remove natural obstructions from the bed of a river in order to improve its navigation. . . . It is settled in this state that he [riparian owner] owns the bed of the river to the middle of the stream. He owns all the rocks and natural barriers in it. He owns all but the public right of passage. The right of passage does not include any right to meddle with the rocks or soil in the bed of the river."

In *Thunder Bay River Booming Co. v. Speechly,* 31 Mich. 335, 18 Am. Rep. 184, in discussing the same relative rights, it is said the right of the public in a navigable or floatable stream is a right only to the stream "in its natural state and ordinary capacity," and that these terms include periodical fluctuations in the volume and height of the water "recurring as regularly as the seasons," and that "any attempt to create capacity at other times at the expense of private interests can be justified only on an assessment and payment of compensation." In *Haines v. Hall,* 17 Ore. 165, 20 Pac. 831, 3 L. R. A. 609, we find a similar condition to that shown in this record. In order to drive the logs down the stream, men were employed and stationed along the bank with cant-hooks and other appliances to prevent the logs from lodging, and to roll them back into the stream, drag them over

gravel bars, turn them around bends, break jams, etc. In dealing with this situation the court said:

"A stream that cannot be used without employing the means and appliances which the appellant made use of in order to float his logs down this one certainly ought not to be regarded as a public highway for any purpose."

In *Felger v. Robinson*, 3 Ore. 455, the court makes use of this language: "Any stream in which logs will go by the force of the water is navigable." *Kamm v. Normand*, 50 Ore. 9, 91 Pac. 448, 126 Am. St. 698, 11 L. R. A. (N. S.) 290, after reviewing numerous authorities, reaches the same conclusion.

Following the rule as established by these authorities, and many others examined but not cited, we reach the conclusion that this river, between the intake and tail race of the appellant, is not a navigable or floatable stream. If we should announce a different conclusion and hold that it was floatable, the right of respondent to make such use of it would not be superior to appellant's right as a riparian owner to use the water for power purposes. In such a case, the rights would be correlative, and each must use his right with due regard to the existence and protection of the other. *Middleton v. Flat River Boom Co.*, 27 Mich. 583; *Buchanan v. Grand River etc. L. R. Co.*, 48 Mich. 364, 12 N. W. 490; *White River Log & Boom Co. v. Nelson*, 45 Mich. 578, 8 N. W. 587, 909. So that, even under such a holding, we could not sustain the lower court in enjoining the appellant from its use of the water. Stuck river is not meandered, while the White river is meandered only upon the right bank. That a stream is not meandered does not of itself establish its character as a navigable or nonnavigable stream. It would indicate nothing more than that, in the opinion of the officers ordering or making the survey, the stream was not navigable. *Griffith v. Holman*, 23 Wash. 347, 63 Pac. 239, 83 Am. St. 821, 54 L. R. A. 178; *Lownsdale v. Gray's Harbor Boom Co.*, 21 Wash. 542, 58 Pac. 663.

Respondent contends that it has riparian rights under its ownership of the timber on the St. Paul land above the intake. It has, however, no ownership in these lands, having acquired only the right to remove the cedar timber therefrom. Appellant's use of the water in no way infringes upon any riparian right attaching to these lands, nor interferes to any extent with the flow of water to which the land itself is entitled by reason of its riparian situation. Neither does it appear to us that respondent's riparian rights below the tail race are in any way interfered with. It contends that appellant, as an upper riparian owner, has no right to disturb the flow of the river in any manner so as to increase or diminish the flow at any particular time, citing Cooley on Torts, 694; that it is an unreasonable detention of waters to gather it into reservoirs and discharge it occasionally in order to increase the natural flow. Referring to the language of the entire section from which this citation is taken, we find that, while it sets forth the general rule that each riparian owner is entitled to the steady flow of the stream according to its natural flow, it also adds that to apply this rule strictly would be to preclude the best use of flowing waters, and where power is desired the rule must yield to the necessity of gathering the water into reservoirs, and that such use is a proper and lawful use when made in good faith and for a useful purpose, with as little interference with the rights of other proprietors as is reasonably practicable under the circumstances, and that for this purpose it is not unreasonable nor unlawful to detain surplus water not used in the wet season and discharge it in proper quantities in the dry season. We have before referred to the fluctuations in the natural flow of these streams. We think it is established by this record that, while appellant was feeding its reservoir, there was an interference with the flow past respondent's riparian lands; that since the plant has been completed the flow of the water has been equalized below the tail race, and no interruptions to speak of have occurred. Neither do we think it

is the law that there can be no diminution whatever to the natural flow of the stream to the lower owner, in the use made by the upper owner; such a rule would deny the upper owner any valuable use of the water. Each owner is entitled to a reasonable use, and any interruption in the flow, unavoidable by reasonable and proper use, is permissible. *McEvoy v. Taylor*, 56 Wash. 357, 105 Pac. 851, 26 L. R. A. (N. S.) 222; *Dumont v. Kellogg*, 29 Mich. 420, 18 Am. Rep. 102; *Red River Roller Mills v. Wright*, 30 Minn. 249, 15 N. W. 167, 44 Am. Rep. 194.

The next question to be determined is whether the Northern Pacific land is entitled to riparian rights as against appellant. At the time appellant acquired its rights on the river, this forty-acre tract did not abut upon the river. The rights acquired by appellant included all riparian rights attaching to all lands abutting the river on either bank, between its intake and tail race. Subsequently the river changed its course, and, at the time of the trial, ran across one end of the forty for a distance of about 250 feet. Respondent contends that the rule applicable to gradual erosion on one bank and gradual accretion on the other should be applied. While that rule is well established, it does not seem to us that it is a proper one whereby to measure these water rights. Appellant, under the doctrine of relation, became possessed of the right to the use of the water in this river in January, 1908. Its rights as an appropriator then became fixed and established, and are superior to the rights of respondent as the owner of land becoming riparian subsequent to that appropriation. In states such as ours, where no notice of appropriation is required for taking water for power purposes, the right relates back to the first substantial act of the appropriator for the acquisition of the right, whether that act be the actual commencement of construction work or other necessary work incident thereto; provided always that reasonable diligence is exercised in finally perfecting the appropriation. Kinney,

Irrigation & Water Rights, § 747, where this rule is announced and the supporting cases cited.

Respondent attacks the diligence of appellant in proceeding with its work, but without referring to the evidence, which leads us to a different conclusion, we think it abundantly appears that, for a work of such magnitude, appellant proceeded with all proper diligence and that at no time from its first adoption of its plan to the final completion of the plant, so far as this record discloses, can it be said there is any act, or the lack of any act, on the part of appellant that would indicate any abandonment or desire to unnecessarily prolong its construction work. We therefore hold that appellant's rights as a prior appropriator are superior to the rights obtained by respondent by reason of the Northern Pacific land becoming riparian. There is no question submitted by this appeal as to the floatability of these rivers during annually recurring freshets. In fact, it is conceded that, if floatable at all, they are only so during the summer months, and that during the winter months, or other times when the streams are subject to freshets or high water, it is impracticable if not impossible to drive shingle bolts, as the current is so swift the bolts will, to use the expression of one witness, "duck" the boom and pass beyond it.

In citing other cases from our own state we should have referred to the case of *Kalama Elec. L. & P. Co. v. Kalama Driving Co.*, 48 Wash. 612, 94 Pac. 469, 125 Am. St. 948, 22 L. R. A. (N. S.) 641, which as here, was a contest between a power company, claiming the right to the use of the water as a riparian owner and prior appropriator, and a driving company claiming the right to create artificial freshets by means of splash dams upon which to drive logs during seasons when the natural flow of the stream was insufficient. That case differs from this in that it was there held that, because of the stream being floatable at times of natural recurring freshets, it was navigable. The driving company also had the right to construct dams and gather water for

artificial flows. The rule announced was that the power company as a riparian owner and prior appropriator had the superior right to water for power purposes, and could enjoin the driving company from retarding the flow of the stream in order to gather the water in its dams for the purpose of creating artificial splashes. While the facts are not parallel, the principle upon which the decision rested—the superior rights of the riparian owner and prior appropriator—is valuable in determining the rights submitted by this appeal.

Counsel for respondent in his argument called attention to the fact that a number of streams in this state, smaller than White river, have been held floatable. This may be true. The floatability of rivers and streams is, however, not to be determined by their size, but by their capacity for valuable public use in their natural condition, irrespective of their size. The right to the use of the waters of these rivers for booming and driving purposes is sought by respondent, principally, if not entirely, for its own use in bringing shingle bolts to its mill. While it has the power under its incorporation to act in such capacity for the public, it never has done so, but has confined its operations to driving and booming shingle bolts intended for its own mill. These facts are worthy of mention only in suggesting that, in so far as the public use or benefit is affected, the use of the water of these rivers as desired by appellant serves a great public need, while that of respondent is in effect for its own private use.

The judgment is reversed, and the cause remanded with instructions to dismiss.

Mount, Main, Ellis, and Fullerton, JJ., concur.