**PUGET SOUND POWER & LIGHT COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**and**

**Washington State Department of Fisheries, Washington State Department of Game, Muckleshoot Indian Tribe, and Secretary of the Interior, Intervenors.**

**No. 78–3211.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1980.

Decided May 4, 1981.

---

Steven C. Marshall, Perkins, Coil, Stone, Olsen & Williams, Seattle, Wash., argued for petitioner; Douglas P. Beighle, Seattle, Wash., on brief.

Donald B. Miller, Boulder, Colo., argued for respondent; McNeil Watkins, II, Washington, D.C., on brief.

Before VAN DUSEN,* ANDERSON and BOOCHEVER, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

We have before us a petition for review filed by Puget Sound Power & Light Company (Puget) challenging an order entered by the Federal Energy Regulatory Commission (Commission)[1] directing Puget to refile its application for a license to operate its hydroelectric generating project located on the White River in the State of Washington. The Commission reversed the findings of the Administrative Law Judge (ALJ)[2] and determined that Puget's White River Project is located on "navigable waters," as that term is defined by section 3(8) of the Federal Power Act, 16 U.S.C. § 796(8), thus conferring licensing jurisdiction upon the Commission in accordance with sections 4(e) and 23(b) of the Act, 16

---

* The Honorable Francis L. Van Dusen, Senior United States Circuit Judge for the Third Circuit, sitting by designation..

1. On October 1, 1977, the Federal Power Commission was replaced by the Federal Energy Regulatory Commission pursuant to the provisions of the Department of Energy Organization Act, 42 U.S.C. §§ 7101, *et seq.*, and Executive Order No. 12009, 42 Fed.Reg. 46267 (September 15, 1977). Many of the FPC's regulatory responsibilities under the Federal Power Act, including all those relevant to this case, were transferred to the FERC.

2. The ALJ's opinion appears at 13 Fed.Power Serv. 5–352 (decided March 3, 1976). The FERC's opinion and order is reported at 13 Fed.Power Serv. 5–332 (issued October 28, 1977), and its opinion and order denying rehearing can be found at 15 Fed.Power Serv. 5–1069 (issued August 9, 1978).

U.S.C. §§ 797(e), 817. Jurisdiction is conferred upon this court by section 313(b) of the Act, 16 U.S.C. § 825*l*(b), and we now affirm.

Puget does not contend that the Commission applied an erroneous test for determining the White River's navigability. Section 3(8) of the Federal Power Act defines "navigable waters" as:

" . . . those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, and which either in their natural or improved condition notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows, or rapids, together with such other parts of streams as shall have been authorized by Congress for improvement by the United States or shall have been recommended to Congress for such improvement after investigation under its authority."

16 U.S.C. § 796(8). This definition parallels the language of the cases that declare the authority of the United States, arising from the commerce clause of the Constitution, over its waters which are capable of use as interstate highways. *See United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); *United States v. Utah*, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931); *Economy Light & Power Co. v. United States*, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921); *The Montello*, 20 Wall 430, 87 U.S. 430, 22 L.Ed. 391 (1874); *The Daniel Ball*, 10 Wall 557, 77 U.S. 557, 19 L.Ed. 999 (1871).

■ In this case, no evidence was offered to establish either that the relevant stretch of the White River is presently navigable, or that it could be made navigable through reasonable improvements. *Appalachian, supra*, 311 U.S. at 407, 61 S.Ct. at 299. Rather, all of the evidence concerned the historic use of the river prior to the time when the hydroelectric project commenced operations in 1911, and thus began diverting a substantial portion of the river's flow. This approach is not fatal to a determination of navigability for "when once found to be navigable, a waterway remains so." *Id.* at 408, 61 S.Ct. at 299. We are satisfied that both the ALJ and the Commission applied the proper test: To find navigability, the evidence must establish that in the past the White River was either used, or was susceptible of being used, in its natural and ordinary condition as a highway for useful commerce. *See Rochester Gas and Electric Corp. v. Federal Power Commission*, 344 F.2d 594, 596 (2d Cir.), *cert. denied*, 382 U.S. 832, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965). If the waterway is merely capable of exceptional transportation during periods of high water, it is not navigable. "The mere fact that logs, poles, and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river." *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698, 19 S.Ct. 770, 773, 43 L.Ed. 1136 (1899).

The only remaining question is whether the Commission's finding of navigability is supported by substantial evidence. The Commission's finding as to the fact of navigability, if supported by substantial evidence, is conclusive. 16 U.S.C. § 825*l*(b); *Conn. Light & Power Co. v. Federal Power Commission*, 557 F.2d 349, 354 (2d Cir. 1977); *Rochester, supra*, 344 F.2d at 596. Puget raises various challenges to the sufficiency of the evidence in this case. We think they must be rejected.

■ In 1913, the Washington Supreme Court decided that the White River was not navigable. *Sumner Lumber & Shingle Co. v. Pacific Coast Power Co.*, 72 Wash. 631, 131 P. 220 (1913). In that case, Sumner Lumber & Shingle Company brought suit against the Pacific Coast Power Company, Puget's predecessor in interest. The lumber company, which operated a shingle mill downstream from the subject power plant, sought to enjoin the power company's di-

version from the White River so as to protect its avenue of getting shingle bolts[3] from up in the wooded mountains downstream to its mill. The company alleged that without the injunction, "its business as a booming company" would be destroyed. *Id.* at 222. The court ruled against the lumber company and held that the White River was not navigable at the precise location now under consideration in this case. Puget argues that the Commission failed to give sufficient weight to the Washington Supreme Court's assessment of the facts in the *Sumner Lumber* case. The ALJ concluded that, "Ignoring a local court's evaluation in 1913 of almost the same facts urged 70 years later borders on the absurd." ALJ's Opinion, 13 Fed.Power Serv. 5–352, at 5–360. Had the Washington Supreme Court applied the same test of navigability that the Commission was obligated to follow in this case, we would be inclined to agree. However, we are convinced that it did not, and a holding under state law is not determinative of navigability under Federal law. *Brewer-Elliot Oil & Gas Co. v. United States*, 260 U.S. 77, 87, 43 S.Ct. 60, 64, 67 L.Ed. 140 (1922); *Wisconsin v. Federal Power Commission*, 214 F.2d 334, 336–337 (7th Cir.), *cert. denied*, 348 U.S. 883, 75 S.Ct. 124, 99 L.Ed. 694 (1954).

■ While the holding in *Sumner Lumber* is of little consequence to the immediate action, the Commission found that the record from that case provided valuable evidence of the historic use of the White River for the flotation of shingle bolts. In their brief to the Commission, the Muckleshoot Indian Tribe and the Secretary of Interior included an appendix containing portions of that record. Selected portions of the testimonies of ten witnesses and twelve duplicate photographs of a shingle bolt drive were included. Whatever objections Puget might have had concerning the consideration of this documentation were lost when it chose to provide the Commission with portions of the record favorable to its position. We think the Commission's considera-

tion of this material was proper and Puget has not contended otherwise. See 16 U.S.C. § 825g(b); *Conn. Light and Power Co., supra*, 557 F.2d at 356; *Montana Power Co. v. Federal Power Commission*, 185 F.2d 491, 498 (D.C.Cir.1950), *cert. denied*, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951).

■ On the evidence in the record before it, as augmented by portions of the record from the *Sumner Lumber* case, the Commission concluded that the White River was navigable. The basis for that decision was the historic use of the river prior to 1911. It was at that time that Puget's predecessor in interest began diverting a substantial portion of the river's flow. The Commission found that the White River had supported navigation by light craft, primarily Indian canoes, and that shingle bolts had been transported downstream for more then twenty years. The shingle bolts were driven on the river at all times of the year *except* at times of high water during the annual freshets. The bolts required nearly constant handling by the drivers to break up jams, free those bolts that were lodged on the banks and shallow areas, and direct them down the main channel of the river. Yet, the drivers did not consider this work difficult, and there was testimony to the effect that it was the most, if not the only, economically feasible method at that time of transporting the bolts to the lumber mills. Our review of the record reveals that the Commission's findings are supported by the evidence.

Puget argues that the evidence of navigation by canoes is insubstantial and cannot establish navigability. Be that as it may, nevertheless, the evidence is relevant. The "personal or private use by boats" may demonstrate "the availability of the stream for the simpler types of commercial navigation." *Appalachian, supra*, 311 U.S. at 416, 61 S.Ct. at 303; *United States v. Utah, supra*, 283 U.S. at 82, 51 S.Ct. at 443. However, we are of the opinion that the river's navigable character must rest upon the evidence of the downstream flotation of shin-

---

**3.** A shingle bolt is a quartered section of a log, normally cedar, and is about four feet six inches in length. They are used for making shingles.

gle bolts. We therefore focus our attention on the evidence and arguments relating thereto.

Puget contends that finding navigability based on the flotation of wood the size of shingle bolts would drastically expand the existing law of navigability. The argument rests upon a misconception of the law. It is not the size of articles transported in commerce that establishes the navigable character of a waterway. Navigability depends upon the stream's usefulness as a transportation mechanism for commerce. "It is obvious that the uses to which the streams may be put vary from the carriage of ocean liners to the floating out of logs; that the density of traffic varies equally widely from the busy harbors of the seacoast to the sparsely settled regions of the Western mountains. The tests as to navigability must take these variations into consideration." *Appalachian, supra*, 311 U.S. at 405–406, 61 S.Ct. at 298. During the relevant period of Washington State's history, shingle bolts were as valuable a commodity as other timber products. The Washington Supreme Court so held:

> " . . . while a single shingle bolt contains but a small amount of timber compared with a saw log, yet in the aggregate timber in that form in this locality is relatively of equal commercial value with saw logs, and its carriage to market is perhaps as important to the timber industry of this state as that of saw logs. Elochoman creek was declared to be navigable for the reason that it furnishes a natural highway for the product of the great logging industry in this state, and Wood's creek should also be held to be navigable because it furnishes a similar highway for the product of another branch of the same industry . . . The reasons leading to the holding in this state, and others where the timber industry is important, that streams which are navigable in fact for the floatage of timber to market shall be public highways for that purpose, are founded upon commercial convenience and necessity because of the environment of the industry."

*Monroe Mill Co. v. Menzel*, 35 Wash. 487, 77 P. 813, 815 (1904). Clearly, shingle-bolt driving was a commercial use of the White River in the constitutional sense.

Shingle bolts were not driven on the White River without difficulty. Nor was the use of the river extensive, or long and continuous. These conditions do not preclude navigability. The language in two Supreme Court decisions is particularly fitting:

> "The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway . . . The vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so, the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers, such as rapids and sandbars."

The *Montello, supra*, 20 Wall at 441–443, 87 U.S. at 441–443.

> "[It is not] necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties or dangers of the navigation influence the regularity and extent of the use. Small traffic compared to the available commerce of the region is sufficient. Even absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense."

*Appalachian, supra*, 311 U.S. at 409–410, 61 S.Ct. at 300.

The evidence in this case is not overwhelming, but the Supreme Court has noted that, "Use of a stream long abandoned by water commerce is difficult to prove by abundant evidence." *Appalachian, supra*, 311 U.S. at 416, 61 S.Ct. at 303. In analyz-

ing the quantum of evidence necessary to support a finding of navigability, we must take "due account of the changes and complexities in the circumstances of a river." *Id.* at 404, 61 S.Ct. at 297. In this case, the settlement of the region under consideration did not begin until the 1850's, the course of the river changed in 1906, and in 1911, Puget's predecessor in interest commenced operation of the power project. Two years later, the Washington Supreme Court rendered its decision in *Sumner Lumber, supra.* The change in the river's course and the commencement of operation of the power project effectively terminated shingle-bolt driving on the relevant stretch of the White River.

In short, we conclude that the Commission's determination of navigability is supported by substantial evidence. Accordingly, the decision and orders of the Commission are

AFFIRMED.