The CONNECTICUT LIGHT AND
POWER CO., Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 748, Docket 76–4212.

United States Court of Appeals,
Second Circuit.

Argued April 4, 1977.

Decided June 27, 1977.

James R. McIntosh, James L. Ackerman, Renard J. Kolasa of Day, Berry & Howard, Hartford, Conn., for petitioner.

Philip R. Telleen, Federal Power Commission, Washington, D.C., for respondent.

Before OAKES, Circuit Judge, and WYZANSKI * and HOLDEN, ** District Judges.

HOLDEN, District Judge:

This petition to review orders of the Federal Power Commission was brought by Connecticut Light and Power Company (CL & P). The petitioner challenges the authority of the Commission to license four hydroelectric projects on the Housatonic River as it flows through the State of Connecticut. The petitioner is joined in this effort by the Candlewood Lake Authority as an intervenor.[1] The Commission, by its orders of May 24, 1976, affirmed the initial deci-

---

* Senior Judge of the United States District Court for the District of Massachusetts, sitting by designation.

** Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

1. The Candlewood Lake Authority is a quasi-governmental agency comprised of five towns bordering Candlewood Lake, which is a large artificial lake that forms the upper reservoir of the Rocky River Project. The area around the lake is a well-developed recreational and residential community. The Authority has inter-

vened on the ground that assertion of FPC licensing jurisdiction would adversely affect the interests of the member towns and of the lake residents by the proposed imposition of a recreation plan. Section 10(a) of the Act, 16 U.S.C. § 803(a), requires that all projects licensed "shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan . . . for other beneficial public uses, including recreational purposes; . . . ." The Authority also claims that assertion of Commission licensing jurisdiction would involve a taking over of the local governmental functions of a recreational area by a private power company and a federal energy

sion of the administrative law judge that the projects are located on navigable waters of the United States within the meaning of Section 3(8) of the Federal Power Act, 16 U.S.C. § 796(8) [2] and that all projects affect the interest of interstate commerce within the meaning of Section 23(b) of the Act, 16 U.S.C. § 817.[3] Application for rehearing was denied by the Commission on July 23, 1976.

The source and headwaters of the Housatonic River are in western Massachusetts. The river flows a total distance of 132 miles and enters Connecticut 83 miles above the mouth where it enters Long Island Sound at Stratford, Connecticut. From the Massachusetts-Connecticut state line the river flows southerly to Bulls Bridge, 52.9 miles upstream from Stratford, thence southeasterly to the tidewater at the twin cities of Shelton and Derby, 13.5 miles upstream, where the tidal reach of the river extends southerly to the mouth at Stratford.[4]

The four projects under review are owned and operated by the CL & P: Bulls Bridge, original construction in 1903; Rocky River, 44.3 miles upstream, erected in 1929; Shepaug, 30 miles upstream and

---

agency. The Intervenor joins the petitioners in their opposition to the assertion of licensing jurisdiction by the Commission and in their argument that the record fails to support the finding that the Housatonic River was or is navigable. Candlewood Lake Authority makes essentially the same claims on appeal as does the petitioner.

2. 16 U.S.C. § 796(8) provides as follows:

The words defined in this section shall have the following meanings for purposes of this chapter, to wit:

(8) "navigable waters" means those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, and which either in their natural or improved condition notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows, or rapids, together with such other parts of streams as shall have been authorized by Congress for improvement by the United States or shall have been recommended to Congress for such improvement after investigation under its authority.

3. 16 U.S.C. § 817 provides as follows:

§ 817. *Projects not affecting navigable waters; necessity for Federal license.*

It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States . . . except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this chapter. Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined in this chapter as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this chapter. If the Commission shall not so find, and if no public lands or reservations are affected, permission is granted to construct such dam or other project works in such stream upon compliance with State Laws. (June 10, 1920, ch. 285, § 23(b), 41 Stat. 1075; Aug. 26, 1935, ch. 687, title II, § 210, 49 Stat. 846.)

4. Connecticut Light & Power's description of the Housatonic River in its initial brief, adopted by the Administrative Law Judge in his decision (Joint Appendix, p. 78):

The Housatonic River has its source in western Massachusetts and enters Connecticut at Mile 83.8. From the Massachusetts-Connecticut state line, the river flows southerly through Connecticut to Bulls Bridge (Mile 52.9) and thence southeasterly to the tidewater at the twin cities of Shelton and Derby at Mile 13.5. From Shelton and Derby, the tidal reach of the river extends southerly to its mouth, where the Housatonic River enters Long Island Sound at Stratford, Connecticut, approximately four miles east of the City of Bridgeport.

constructed in 1955; and Stevenson, 19.3 miles upstream, constructed originally in 1919, but enlarged in 1936. Rocky River is a seasonal pumped-storage hydroelectric facility; the other three projects are run-of-river hydroelectric facilities.

After inquiry by the Commission concerning whether CL & P proposed to file applications to license the project, and a subsequent communication proposing a shortened license term unless applications were promptly filed, CL & P applied under protest for licenses for Bulls Bridge, Rocky River and Shepaug in 1966 and for Stevenson in 1967. On December 27, 1973,[5] following this court's decision in *Farmington River Power Co. v. F.P.C.,* 455 F.2d 86 (2d Cir., 1972), CL & P filed notice of withdrawal of the applications, contending that the Commission lacked licensing jurisdiction over the projects. The proceedings now under review were ordered to be conducted by the Presiding Administrative Law Judge to determine disputed questions of fact on the issue of Commission's licensing jurisdiction over the four projects. After extended hearings and a detailed report of the facts, the law judge concluded that Housatonic River constituted navigable waters as defined in the Federal Power Act and all projects are subject to the licensing jurisdiction of the Federal Power Commission. The correctness of that decision is the question for review.

### Res Judicata and Estoppel

At the outset we are called upon to consider the petitioner's claim that the Commission is barred by the operation of *res judicata* and collateral estoppel from finding the Housatonic navigable. The claim is based on a 1952 order of the FPC in *Electric Power Inc.,* 11 F.P.C. 1548, following the declaration of intention to construct the Shepaug project, filed by the CL & P's predecessor.

The first sentence of Section 23(b) makes it unlawful for any person, state or municipality to construct a dam to develop electric power in any of the navigable waters of the United States except by a license granted under the Federal Power Act. This proscription is followed by the provision that any person, state or municipality intending to construct a dam or other project in any stream "other than those defined in this chapter as navigable waters, and over which. Congress has jurisdiction under its authority to regulate commerce—shall before such construction file declaration of such intention with the Commission . . . ." If upon investigation the Commission finds the interest of commerce would be affected, a license is required. The third sentence of Section 23(b) provides:

If the Commission shall not so find, and if no public lands or reservations are affected, permission is granted to construct such dam or other project works in such stream upon compliance with State laws.

The Commission issued its findings on December 24, 1952. After describing the project proposed by the petitioner's predecessor, the Commission determined:

The interest of interstate or foreign commerce would not be affected by the construction and operation of the proposed Shepaug development: *Provided, however,* that these findings shall not be construed as relating to any effects upon the interests of interstate or foreign commerce which might be caused by any existing hydroelectric developments located on the Housatonic River.

It is significant that CL & P's predecessor, Electric Power, Inc., did not apply for a license to construct the Shepaug Project on a navigable stream under Section 23(b). The power company made its own determination that the Housatonic was not navigable within the meaning of the Act. Acting on this independent judgment, the company proceeded as a declarant to state its intention to construct the project, thereby invoking the Commission's authority to decide the narrow issue of whether the proposed project would affect the interests of inter-

---

5. Joint Appendix, pp. 20–44.

state or foreign commerce.[6] This was the single issue presented by Electric Power's declaration of intention. The issue of navigability of the Housatonic was not engaged nor decided.

The conclusive effect of an administrative determination is limited to the purpose for which it was made. Since the issues on the declaration of intention presented in 1952 are not the same as those presented in the pending application for a license, the law of *res judicata* does not apply. *Cf. Federal Trade Commission v. Motion Picture Advertising Service Co., Inc.,* 344 U.S. 392, 398, 73 S.Ct. 361, 97 L.Ed. 426 (1953) (issue of unfair competition not controlled by prior administrative determination as to conspiracy to restrain trade).

CL & P advances the further argument that the 1952 declaration of intention to construct the Shepaug project afforded the opportunity to litigate the issue of navigability. Hence, it is urged that we are precluded from consideration of the issue in

the context of the licensing applications for all projects on the river, by operation of collateral estoppel. The argument is not persuasive. The doctrine is operative only as to facts that were actually litigated and decided. Facts which might have been decided, but were not, are not precluded. *Last Chance Mining Co. v. Tyler Mining Co.,* 157 U.S. 683, 687, 15 S.Ct. 733, 39 L.Ed. 859 (1895); Restatement, Judgments § 68.

Nor are we convinced that the findings issued in consequence of the declaration of intention by Electric Power, Inc., to construct the Shepaug project, bar the Commission's reconsideration of the effect of the post-1935 construction on interstate commerce. At the time of the 1952 determination of the Commission did not have the benefit of the enlightenment on the expanded jurisdictional base that was subsequently provided by the Supreme Court in *Federal Power Commission v. Union Electric Co.* (Taum Sauk), 381 U.S. 90, 85 S.Ct. 1253, 14 L.Ed.2d 239 (1965).[7]

---

**6.** *Findings of the Commission, Electric Power, Inc., Docket No. E-6437*

On June 2, 1952, Electric Power, Inc., of Berlin, Conn., filed a declaration of intention under Section 23(b) of the Federal Power Act to construct on privately-owned lands a dam and powerhouse on the Housatonic River approximately 30 miles above its mouth and about 17 miles upstream from the cities of Derby and Shelton, Conn., in the town of Newton, Fairfield County, and the town of Southbury, New Haven, Conn., to be known as the Shepaug project.

The Housatonic River rises near Washington station, town of Washington, Mass., flows northward through Hinsdale to Dalton, thence southwest to Pittsfield in western Massachusetts, and thence in a general southerly direction about 132 miles across the States of Massachusetts and Connecticut to its mouth in Long Island Sound at Stratford 5 miles east of Bridgeport, Conn. The drainage area comprises 1.948 square miles, of which 498.4 lie in western Massachusetts, 215.4 in eastern New York, and 1,234.2 in western Connecticut.

According to the declaration of intention, the proposed project will consist of a gravity type concrete dam 1,412 feet long with maximum height of 139 feet; a reservoir having an area of 1,879 acres with normal usable volume of 5,038 acre-feet and normal drawdown of 3 feet; a powerhouse containing one vertical shaft, Kaplan adjustable blade, pro-

peller type turbine having a rated capacity of 57,000 horsepower—the rated capacity of the generator being 37,250 kilowatts.

The Commission *finds:*

(1) The construction and operation of the proposed Shepaug development will not affect any public lands or reservations of the United States.

(2) The interests of interstate or foreign commerce would not be affected by the construction and operation of the proposed Shepaug development: *Provided, however,* That these findings shall not be construed as relating to any effects upon the interests of interstate or foreign commerce which might be caused by any existing hydroelectric developments located on the Housatonic River.

*Adopted: December 22, 1952. Issued: December 24, 1952.*

**7.** In *Taum Sauk* the Court stated:

The scope of this language is not restricted by the earlier clause in § 23(b) limiting the filing requirements to projects on nonnavigable streams "over which Congress has jurisdiction under its authority to regulate commerce" that is, tributaries of river systems necessitating supervisory power to preserve or improve downstream navigability or water commerce generally. This language merely designates those who must file a declaration of intention—all those who would locate a water power project on a nonnavigable stream within the jurisdiction of Congress

■ The Commission's determination of lack of interstate effect as to Shepaug did not reach the question of navigability. Its conclusion, that commerce was not affected, did not constitute permission to maintain the project license-free in perpetuity. It is contrary to the purpose of the Act, that "a determination of lack of effect on commerce would forever oust the Commission of jurisdiction . . . ." *Nantahala Power and Light Co. v. Federal Power Commission*, 384 F.2d 200, 210 (4th Cir. 1967) (Sobeloff, J.).

*Navigability*

Since the question of the navigability of the Housatonic River is not precluded by the Commission's prior findings on the 1952 declaration of Electric Power, Inc., we turn to the record to determine whether the Commission's decision on the prime issue is supported by substantial evidence. Such is the standard of review prescribed in Section 313 of the Act. (16 U.S.C. § 825*l*(b)). *E. g. Gainesville Utilities Department v. Florida Power Corp.*, 402 U.S. 515, 91 S.Ct. 1592, 29 L.Ed.2d 74 (1971); *Scenic Hudson Preservation Conference v. Federal Power Commission*, 453 F.2d 463 (2d Cir.), *cert. denied* 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972).

The report of the administrative law judge attributes the navigability of the Housatonic to several factors: its past and present suitability for use as a boatable water and the history of the river in the transport of logs from upstream logging operations to downstream markets. The appellant does not challenge the navigability of the river from Shelton Dam, 13.5 miles upstream, to Long Island Sound. The question is the substantiality of the evidence concerning the navigability of the Housatonic from Bulls Bridge, some 53 miles upstream from the mouth, to Otter Rock, 35 miles to the south.

The evidence is replete with historical material which records transportation on the Ousatannick (since 1840 the Housatonic) by rafts, canoes and small boats from colonial days to recent times.[8] And there is historical data of use of the river from as far north as Pittsfield, Massachusetts, to Long Island Sound.[9] The record contains historical documentation of the fact that the river was used for the navigation of boats, rafts and other "stout" craft for access to the Indian trading post established at Goodyear Island below New Milford.[10] There are other historical writings that report that the Indians in the Housatonic Valley "used the river as a highway to the shores of the Sound."[11] The administrative judge further reported evidence of boating by small craft on the Housatonic. Some of such testimony was elicited from witnesses presented by CL & P and the intervenor.[12]

are required to declare their intention so that the Commission may determine the necessity for a license. Congress then proceeds to invoke its full authority over commerce, without qualification, to define what projects on nonnavigable streams are required to be licensed.
381 U.S. at 96–97, 85 S.Ct. at 1257 (citations omitted).

8. Jt. App. pp. 153–199.

9. *Boating Trips on the New England Rivers,* Henry Parker Fellows (1884) (Ex. 21). Jt. App. pp. 213 et seq.

10. *Two Centuries of New Milford, Connecticut,* prepared under the direction of the historical committee of citizens of New Milford. Grafton Press, New York 1907, contains an historical account (Circa 1738) of a recently married couple who packed their "House Plenishing—in a stout boat to be rowed and poled up the (Great)

river this being at the time, the only means of conveying heavy articles to the settlements above."

11. *Connecticut Woodlands*, Vol. XXXIII Number 1, "The History of Land Use in the Housatonic Valley," Elwood Maunder. Jt. App. p. 153.

12. The administrative law judge reported the evidence of recent navigation by boat as follows:
    (1) *Transportation by boat.* The record is not wholly devoid of contemporary or recent events, nor of firsthand accounts, and it may be useful to begin with these.
    CLP witness Lyle Thorp testified that he had been up and down the river in boats many times, particularly in the section from Falls Village to New Milford. He stated further that many years ago he had designed and had had special boats built for stocking the larger rivers with trout and, presumably,

The Commission's affirmative determination of navigability does not rest entirely on the evidence of boatable navigation. The resolution of the issue is also founded on evidence of flotation of logs incident to logging operations along the Housatonic.

There is a persuasive historical account written by a reputable historian, contemporary to the events recorded, which states:

> At the commencement of the rise of the waters in the spring, thousands of logs of *pine* and *hemlock* have been thrown into this river, and floated down its current from Great Barrington and Sheffield [Massachusetts] for years, over the falls at Canaan, to New Milford and Derby, where they have been converted into boards, plank, shingles, etc., for market in Connecticut and New York. The rise of the water has commonly carried them safely over the rocks in the stream.

> Their passage over the Falls has often been witnessed with amazement. This trade has carried a very great portion of the pine timber from the south part of the County. (Emphasis in original).[13]

The Commission found this historical account to be confirmed by various historical records and state papers, including two enactments by the Connecticut General Assembly in the late eighteenth and early nineteenth centuries. The earliest of these authorized the clearing of rocks and other obstructions in a stretch of the river from New Town (mile 20) to a point above the Great Falls at New Milford to aid navigation and to construct locks at some points,— "*Provided nevertheless* that nothing in this Act be construed in the least Degree to effect the rafting of Timber and Lumber down the present Bed or Channel of said

---

at least some times, he used this type of boat on the Housatonic. Tr. 354. Even assuming that he confined himself to the area between Falls Village (mile 76) and New Milford (mile 43), he traversed the water between Bulls Bridge (mile 53) and Rocky River (mile 44). Mr. Benedict, of the Candlewood Lake Defense Association, testified that, in the summer of 1974, a canoe trip was made from Falls Village to Derby (Tr. 593). All four projects are included in this stretch of the river.

The Yale University Crew utilizes Lake Housatonic for training, racing, and other purposes from February 15 through June and from September through November every year; the racing shells and several boats, one 32 feet long, with a draft of 3 to 4 feet traverse the Lake from the boathouse, half a mile above Derby Dam, to a point 18 miles above the mouth of the Housatonic River (Tr. 508).

The New York Times of April 20, 1975, published an account of a trip by three men in a canoe from New Milford to the Stevenson Dam (mile 19). I took official notice of this report in an order dated April 22, 1975, which afforded the parties an opportunity to comment.

13. Excerpt written by the Reverend Chester Dewey for the *History of the County of Berkshire*, published in 1829.

The recollections of Frank Stowe, a long-time resident of the Housatonic in the 1800's constituted further evidence of the rafting of timber during the spring freshets. In a published speech by Samuel Church in 1881 in Salisbury,

Connecticut, the erection of a paper mill "at the great falls of the Housatonic" was referred to. Mr. Church, speaking at the 100th anniversary of the First Annual Town Meeting of the Town of Salisbury, noted that an extensive lumber business had been erected around 1785: "Pine timber in large quantities, and of excellent quality, was by the spring freshets annually drifted down the river from the towns above."

In a 1716 deed conveyed by the Indian, Weromaug, to one Benjamin Fayerweather and his associates and recorded in the office of the Secretary of State of the State of Connecticut, a portion of the Housatonic River (formerly the Stratford Great River) north of New Milford was referred to as the "Mast Swamp". The deed expressly granted the right to the "use and benefit of the said Great River to pass and repass in at any time and at all times with Rafts trees Loogs (sic) or What Else so ever . . . .." Referring to the conveyance in his *History of Cornwall, Connecticut*, published in 1926, Edward C. Starr, B.D. stated that "(t)he Mast Swamp was so named because timber for masts was there cut and floated down the river."

There is also reference to Mast Swamp in the history of the exploits of Mathew Lyon. *They Found A Way* by Iveagh Hunt Sterry and William H. Garrigus, 1938, Brattleboro Stephen Days Press.

(T)he lumberjacks of Mast Swamp gloried in tales of his strength in handling the tall pines cut for shipbuilders at Derby and Hudson River yards.

River and the Fishing thereof." [14] The subsequent enactment of May 1807 extended prior legislation "regulating the floating of logs and other timber, shingles and staves down the Connecticut river . . . to the floating of logs, lumber, shingles and staves down the Ousatannick river." Statute Laws of the State of Connecticut, Book 1, 1808.

■ The Commission's reliance on historical data and ancient documents is legally justified. Such reference is commonly made in proceedings where navigability is in issue. The objection that the evidence accepted by the administrative judge is impermissible hearsay is unavailing. Evidence contained in public records and reports, recorded deeds affecting interest in real property and learned historical treatises are exceptions to the hearsay rule. Federal Rules of Evidence 803(8)(14)(18)(20); 5 Wigmore, Evidence §§ 1597–1598. The importance of such evidence in proceedings under the Federal Power Act was observed by Judge Bazelon in *Montana Power Co. v. Federal Power Commission*, 87 U.S.App. D.C. 316, 185 F.2d 491, 498 (1950):

> [I]t is settled that historical works generally considered authentic are admissible in evidence, especially in cases such as this one which must delve into the relatively ancient and obscure origins of commerce on the nation's rivers. (footnote omitted). At any rate, we do not think the hearsay rule is applicable to administrative proceedings so long as the evidence upon which an order is ultimately based is both substantial and has probative value.

It is so here; the instant proceedings are well within the pattern of *Montana Power*.[15]

The Commission recognized that the evidence of navigability was "not overwhelming." This does not drain it of substance. Despite the petitioner's efforts to discredit the reliability of its sources, the evidence is persuasive against the negative approach adopted by petitioner's experts.

■ The main effort of the petitioner's resistance to the Commission's decision on navigability of the Housatonic is based on the physical characteristics and topography of the river bed. We are referred to the steep gradient of the flow of the river in Connecticut and the numerous rapids, waterfalls and boulders which interdict any significant commerce on regular travel. And it is said that its irregular flow from spring floods to low water is inadequate to support commercial use.

> To appraise the evidence of navigability on the natural condition only of the waterway is erroneous. Its availability for navigation must also be considered. "Natural and ordinary conditions" refers to volume of water, the gradients and the regularity of the flow. A waterway otherwise suitable for navigation is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken. (Footnote omitted).

*United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 407, 61 S.Ct. 291, 85 L.Ed. 243 (1940). Navigability may be established despite natural obstructions. *Id.* at 409, 61 S.Ct. 291. Capability for public use for purposes of river transportation is the true criterion. *Economy Light Co. v. United States*, 256 U.S. 113, 122, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

It is abundantly clear that the Housatonic comes within the observation made by

---

**14.** Public Records of the State of Connecticut, from May 1793 to October 1796, compiled in Accordance with an Act of the General Assembly.

**15.** The petitioner attacks the historical evidence of navigation on the Housatonic that outdates the formation of the Union on the premise that the underlying grant of power in the Commerce Clause concerning commerce

among the several states. We think the Commission adequately disposed of the objection on the strength of *The Montello*, 87 U.S. 430 (20 Wall), 22 L.Ed. 391 (1874). There the use of the Fox River in the carriage of boats in the northwest fur trade after the exploration of the Mississippi and its tributaries by Marquette and Joliet were deemed important to the court on the issue of navigability.

the Court in *The Montello*, 87 U.S. 430, 443, 22 L.Ed. 391 (1874):

> Indeed, there are but few of our freshwater rivers which did not originally present serious obstructions to an uninterrupted navigation. In some cases, like the Fox River, they may be so great while they last as to prevent the use of the best instrumentalities for carrying on commerce, but the vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers such as rapids and sandbars.

That the Housatonic is hazardous to navigation in certain areas of its flow from Bulls Bridge to Long Island Sound is demonstrated in the record. Indeed, the findings adopted by the Commission determined that the river was not amenable to extensive improvement in this regard, at least at reasonable cost. The record demonstrates that the law judge considered other evidence by way of official government documents, including reports of the United States Corps of Engineers which indicate directly or by implication that open navigation is restricted for a relatively short distance upstream from its mouth. He concluded, however, that the reference to navigability in these reports was undefined and not made in the sense of the definition provided in Section 3(8) of the Act.

Against this, the Commission concluded the substantial evidence of use of the Housatonic for boating and the flotation of logs was more convincing. "(T)he uses to which the streams may be put vary from the carriage of ocean liners to the floating out of logs . . . ." *Appalachian Power Co., supra*, 311 U.S. at 405, 61 S.Ct. at 298. And the lack of commercial traffic does not preclude "a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation." *Id.* at 416, 61 S.Ct. at 303, citing *United States v. Utah*, 283 U.S. 64, 82, 51 S.Ct. 438, 75 L.Ed. 844 (1931).

The Commission's findings cannot be overturned because the river was navigated primarily at early stages in the economic development of western Connecticut. Nor is its determination undermined because extensive improvement for purposes of river traffic became impracticable by reason of the availability of more efficient means of interstate transport. *Rochester Gas and Electric Corp. v. Federal Power Commission*, 344 F.2d 594, 597 (2 Cir. 1965). "When once found to be navigable, a waterway remains so." *United States v. Appalachian Power Co., supra*, 311 U.S. at 408, 61 S.Ct. at 299.

As we have seen from that which is written above, substantial evidence was presented of the historic use of the Housatonic from its headwaters to Long Island Sound. The Commission's reliance on this proof is sound in fact and well founded in law. The logging factor on the issue of navigability was recognized by the Supreme Court in *Appalachian Power Co., supra* at 411, 61 S.Ct. 291, and in *St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners*, 168 U.S. 349, 359, 18 S.Ct. 157, 42 L.Ed. 497 (1897). More recently it has had dominant effect. *See State of Wisconsin v. Federal Power Commission*, 214 F.2d 334, 337 (7th Cir. 1954); *Wisconsin Public Service Corp. v. Federal Power Commission* (Tomahawk) 147 F.2d 743, 747 (7th Cir.), *cert. denied* 325 U.S. 880, 65 S.Ct. 1574, 1575, 89 L.Ed. 1996 (1945).[16]

The total record presented in this review revisits the scenes and struggles of the early settlers along the historic Housatonic Valley, the river's part in the economic development of the region it serves and the complex physical characteristics, includ-

---

16. This doctrine has evolved from the settled concept that the floating of logs on interstate rivers constitutes interstate commerce. *E. g. Hughes Bros. Co. v. Minnesota*, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359 (1926); *Champlain Realty Co. v. Brattleboro*, 260 U.S. 366, 43 S.Ct. 146, 67 L.Ed. 309 (1922); *St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners, supra*.

ing gradient, the nature of its flow and physical obstruction. The fabric of the proof sustains the ultimate finding of the Commission that the Housatonic River from the site of the Bulls Bridge project to Long Island Sound was used and is suitable for transporting property in interstate and foreign commerce within the meaning of the Federal Power Act.

Since we affirm the Commission's jurisdiction on the primary issue of navigability, it is not essential to reach the secondary and independent jurisdictional base of its authority on the effect of the Shepaug and Stevenson projects on interstate commerce under Section 23(b) of the Act.

The order of the Commission is affirmed.