954 F.2d 56
 131 P.U.R.4th 356
 STATE of New York ex rel. NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION and Niagara Mohawk
Power Corporation, Respondents.
 No. 303, Docket 91-4102.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 7, 1991.
Decided Jan. 13, 1992.
 
 Maureen F. Leary, Asst. Atty. Gen., Albany, N.Y. (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Douglas H. Ward, Asst. Atty. Gen., of counsel), for petitioner.
 Joseph S. Davies, Deputy Sol., Washington, D.C. (William Sherman, Gen. Counsel, Jerome M. Feit, Sol., Thomas J. Lane, Atty., of counsel), for respondent F.E.R.C.
 Brian K. Billinson, Syracuse, N.Y., for respondent Niagara Mohawk Power Corporation.
 John D. Echeverria, Washington, D.C., submitted a brief for American Whitewater Affiliation, amicus curiae.
 Before OAKES, VAN GRAAFEILAND and NEWMAN, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 Enactment of the Federal Power Act in 1920 was the end result of a bitter fight in Congress between private power interests and public conservationists. See Gifford Pinchot, The Long Struggle For Effective Federal Water Power Legislation, 14 Geo.Wash.L.Rev. 9 (1945); see also First Iowa Hydro-Electric Coop. v. FPC, 328 U.S. 152, 180 & n. 23, 66 S.Ct. 906, 919 & n. 23, 90 L.Ed. 1143 (1946). Since that time, federal jurisdiction under the Act has been expanded substantially, due in large measure to broadening of the concept of "navigable waters" as that term is used in the Act. William A. Campbell, Note, Expanding Jurisdiction of the Federal Power Commission and the Problem of Federal-State Conflict, 18 Vand.L.Rev. 1847, 1850 (1965); Richard M. Frank, Forever Free: Navigability, Inland Waterways, and the Expanding Public Interest, 16 U.C.Davis L.Rev. 579, 591-604 (1983). The instant case involves proposed federal licensing of two Niagara Mohawk Power Corporation powerhouses, the Bennetts Bridge Powerhouse and the Lighthouse Hill Powerhouse, both located on the Salmon River in New York State. In holding that no licenses were required for these two projects, 53 F.E.R.C. p 61,329, the Federal Energy Regulatory Commission (FERC) inexplicably departed from the above-described pathway of progress, a pathway forged in the public interest. For the reasons that follow, we set the order aside.[1]
 
 
 2
 The Salmon River is approximately 50 miles long. It originates in Lewis County and flows in a generally westerly direction through Jefferson and Oswego Counties emptying into Lake Ontario at Port Ontario. A 110-foot waterfall is located approximately 20 miles from the mouth of the river. The Salmon River Reservoir Dam, which serves the Bennetts Bridge Powerhouse, is located approximately one mile above the falls, and a reservoir approximately six miles long is impounded above that dam. The Bennetts Bridge Powerhouse is located approximately 3.5 miles below the dam. The Lighthouse Hill Dam, which impounds a smaller reservoir, and the Lighthouse Hill Powerhouse are located about one mile below the Bennetts Bridge Powerhouse.
 
 
 3
 In 1972 the Power Commission's Section of Project Analysis was asked to make a Navigation Report of the Salmon River with specific reference to Niagara Mohawk's Power Projects. Researching historical records, a procedure that is legally justified in circumstances such as this, Connecticut Light & Power Co. v. FPC, 557 F.2d 349, 356 (2d Cir.1977), the researchers learned that early settlers had used the Salmon River "extensively for transportation" and that before the opening of passable roads, the river was the "scene of considerable commercial activity". Prominent in this commercial activity during a large part of the nineteenth century was the floating of logs and lumber cut from the surrounding forests. The Section members learned, for example, that a well-known Oswego resident named D.C. Littlejohn erected a sawmill on the Mad River, a tributary of the Salmon about 16 miles above the falls, where he cut large quantities of timber that were floated down into the Salmon River. They also learned that in 1884 the New York Legislature authorized the appropriation of $6,000 "for the purpose of removing obstructions from and otherwise improving the Salmon river and the main branch of the same, known as the Mad river, public highways for the passage of lumber, logs and other timber, in the counties of Oswego and Jefferson."[2] Chap. 542 Laws of 1884. The money was to be used for "improving the channel, docking and protecting the banks of said rivers." Id. In its written report dated October 2, 1972, the Project Analysis Section concluded: "The Salmon River can be considered a navigable stream at the Lighthouse Hill and Bennetts Bridge Projects."
 
 
 4
 Influenced by the Project Analysis Section's report and the New York Legislature's description of the Salmon River as a public highway for the passage of logs and lumber, the Commission's Director of the Office of Hydropower Licensing issued orders on April 22, 1987, directing Niagara Mohawk to obtain federal licenses for its Salmon River hydropower projects.
 
 
 5
 On December 9, 1988, FERC (the successor to the Federal Power Commission (FPC), 42 U.S.C. §§ 7171(a), 7172(a)), denied Niagara Mohawk's appeal from the Hydropower Licensing Director's order. The Commission found "available references to all the relevant sections [of the river], both above the falls and from the falls to Lake Ontario, being boatable, to rafting on the section from the falls to Lake Ontario, and to the use of bateaux with respect to the Richland area [between Niagara Mohawk's project and the lake]." The Commission took cognizance of a reference in the 1824 Gazetteer of the State of New York that "[t]here is a good harbor at the mouth of Salmon River, for schooners of 50 or 60 tons." The same Gazetteer also stated that "10 to 1,200 barrels, of salmon alone," were taken from the river each year and found a "ready market at 8 to 10 dollars a barrel." John C. Churchill, another historian quoted by the Commission, stated:
 
 
 6
 Few towns in this country have afforded lumbermen more profitable employment than has Orwell. Its dense forests long contributed millions of logs to the numerous saw mills within its borders as well as to many others operated nearer the lake [Ontario]. At one time the manufacture of lumber and kindred products formed the chief industry of the town, and as late as 1860 sixteen saw mill [sic], as many shingle mills ... were in active operation. The valuable mill sites were early sought and utilized, and the wealth of distant markets flowed into the coffers of the proprietors.
 
 
 7
 The Commission found "available evidence of significant and substantial use of all the relevant sections, both above and below the falls, for logging." The Commission discussed historical references to the effect that efforts had been made to improve the Salmon River by removing obstructions so that logs could be more easily floated down its waters, notably in 1871, when the Salmon River Improvement Company was incorporated with a capital of $50,000, and that "thenceforth the business of floating logs assumed greater proportions than at any previous date."
 
 
 8
 The Commission found that the Salmon River "in the reaches from the falls down to Lake Ontario, and even in the reaches above the falls, was used and was suitable for use as a highway for commerce" and that "even if the reach above the falls were not navigable waters, both projects would require licensing because of the location of the powerhouse of the Lighthouse Hill Project on navigable waters." The Commission stated that, while the evidence may not have been superabundant, it was substantial. It concluded:
 
 
 9
 [T]he Salmon River from its mouth at Lake Ontario, an acknowledged avenue of interstate and foreign commerce, up to and beyond the Salmon River Falls constitutes navigable waters under the FPA. Niagara Mohawk's projects at issue in this proceeding are within the reaches found navigable.
 
 
 10
 All five members of the Commission concurred in this ruling.
 
 
 11
 Niagara Mohawk petitioned the Commission for rehearing upon the following three grounds.
 
 
 12
 1. The evidence cited is not substantial and, in no event, permits an inference to be drawn that goods were ever transported or portaged around the 110-foot waterfalls.
 
 
 13
 2. Contrary to the assumption in the order on appeal, there is no evidence that the Salmon River has been or could with reasonable improvements be used as a continuous avenue for the transportation of goods in interstate commerce.
 
 
 14
 3. The order on appeal erred in concluding that evidence of mere boating and rafting in portions of the River during times of high water supports a finding of navigability.
 
 
 15
 Despite the absence of merit in these grounds, a three-member panel of the Commission, only one member of which was on the original panel, held that the original panel erred, stating that "[t]here is no evidence that logs were floated over the Falls or to the mouth of the river, or that products made from logs were transported by water to or past the mouth of the river."
 
 
 16
 Thereafter the New York State Department of Environmental Conservation petitioned pursuant to 18 C.F.R. § 385.214 to intervene as a party and for rehearing and reconsideration of the Commission's second ruling pursuant to 18 C.F.R. § 385.713. Another petition for intervention and rehearing was filed by the American Whitewater Affiliation (A.W.A.), a national non-profit organization whose charter purpose was the enjoyment and preservation of American waterways. The Commission at first denied the requests for intervention and rehearing. However, it subsequently granted the intervention petitions but continued to deny the rehearing requests. We address first Niagara Mohawk's asserted requirement that the Salmon River constitute a "continuous avenue" for the transportation of goods and concomitantly that there must be evidence, direct or inferential, that goods were "transported or portaged around the 110-foot waterfalls [sic]" in the river.
 
 
 17
 Section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The word "shall", as used therein, is not without meaning:
 
 
 18
 Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. (emphasis supplied, citation omitted)
 
 
 19
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971).
 
 
 20
 Because the issue in the instant case is navigability, the appropriate starting point for our discussion is the definition of "navigable waters" contained in 16 U.S.C. § 796(8), which provides in pertinent part:
 
 
 21
 (8) "navigable waters" means those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, and which either in their natural or improved condition notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows, or rapids....
 
 
 22
 This statute must be interpreted in the light of the Supreme Court's observation in FPC v. Union Elec. Co., 381 U.S. 90, 101, 85 S.Ct. 1253, 1259, 14 L.Ed.2d 239 (1965), that "[i]n order to insure comprehensive control over the utilization of the Nation's waterways, 'navigable stream' was broadly defined to include the interrupting falls, shallows, rapids and the waterways authorized by or recommended to Congress for improvement."
 
 
 23
 The Commission recognized and correctly applied this statute in its original decision finding navigability. The Commission quoted with approval the statement in United States v. Appalachian Elec. Power Co., 311 U.S. 377, 409, 61 S.Ct. 291, 300, 85 L.Ed. 243 (1940), that navigability can be found "despite the obstruction of falls, rapids, sandbars, carries or shifting currents." The Commission also cited this court's decision in Rochester Gas & Elec. Corp. v. FPC, 344 F.2d 594 (2d Cir.), cert. denied, 382 U.S. 832, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965). At issue in Rochester Gas was the proposed licensing of three hydro-electric projects on a stretch of rapids and falls six miles from the mouth of the Genesee River. In that case no claim was made, or could have been made, that boats or any other objects of commercial significance ever were floated over the two high falls where the hydro-electric projects were located. Citing United States v. Appalachian, supra, we held that, since the river was navigable below and above the rapids and falls, the rapids and falls themselves were "navigable waters." Id. at 595-96. That, in substance, is what the Commission held in its original decision herein.
 
 
 24
 In its opinion of reversal, the panel said "this case does not involve questions of legal interpretation, but hinges entirely on the facts, and on whatever reasonable inferences can be drawn from those facts." This was a misstatement of the Commission's obligation. The issue of navigability involves mixed and inseparable questions of law and fact. United States v. Appalachian, supra, 311 U.S. at 404, 61 S.Ct. at 297; Owen v. United States, 851 F.2d 1404, 1417 (Fed.Cir.1988); Loving v. Alexander, 745 F.2d 861, 865 (4th Cir.1984). Factual findings by the Commission have significance only if viewed in the light of the statute. Here, however, the Commission, ostensibly having eschewed interpretation of the law, proceeded to misinterpret it by accepting and relying upon the first two grounds for rehearing asserted by Niagara Mohawk.
 
 
 25
 Assuming for the sake of argument only that there was no evidence that logs were floated over the falls, this lack of evidence would not be determinative of the issue of navigability. FPC v. Union Elec. Co., supra, 381 U.S. at 101, 85 S.Ct. at 1259 ("navigable stream" broadly defined to include interrupting falls). We may take it as a given that few commercially significant logs float over the mighty falls of the Niagara River, which consistently has been held to be a navigable stream. Sawczyk v. United States Coast Guard, 499 F.Supp. 1034, 1040 (W.D.N.Y.1980); West Virginia Pulp & Paper Co. v. Peck, 189 A.D. 286, 292, 178 N.Y.S. 663 (N.Y.App.Div.1919). This court need not blindly adhere to administrative findings that are based upon an erroneous interpretation of the law.
 
 
 26
 Niagara Mohawk's third ground, belittling evidence of "mere boating and rafting", also demonstrates a misunderstanding of well-settled law. See Connecticut Light & Power Co. v. FPC, supra, 557 F.2d at 357; Alaska v. Ahtna, Inc., 891 F.2d 1401, 1404-05 (9th Cir.1989), cert. denied, 495 U.S. 919, 110 S.Ct. 1949, 109 L.Ed.2d 312 (1990); North Dakota v. Andrus, 671 F.2d 271, 278 (8th Cir.1982), rev'd on other grounds sub. nom. Block v. North Dakota, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); Swans Falls Corp., 53 F.E.R.C. p 61,309 (1990); David Zinkie, 53 F.E.R.C. p 61,029 (1990).
 
 
 27
 We find no merit in the Commission's attempt in footnote 10 of its February 4, 1991 order to distinguish its prior holdings in Swans Falls and Zinkie, supra, on the ground that, unlike the Salmon River, the rivers in those cases crossed state lines. The Salmon River empties into Lake Ontario and thus is part of a direct pathway of commerce not only to other states but also to other countries. Under these circumstances the fact that the river itself lies entirely in New York State does not make it any the less a navigable water of the United States. See Kaiser Aetna v. United States, 444 U.S. 164, 172 n. 7, 100 S.Ct. 383, 389 n. 7, 62 L.Ed.2d 332 (1979) (quoting Ex Parte Boyer, 109 U.S. 629, 632, 3 S.Ct. 434, 435, 27 L.Ed. 1056 (1884)); The Daniel Ball, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871); City of Centralia v. FERC, 851 F.2d 278, 279 (9th Cir.1988).
 
 
 28
 Despite its broad discretion, the Commission cannot arbitrarily treat similar situations dissimilarly. See Local 777 v. NLRB, 603 F.2d 862, 872 (D.C.Cir.1978). Uncontroverted evidence of past and present usage of the Salmon River for both boating and logging was so substantial that its rejection by the Commission was arbitrary and capricious and constituted a clear error of judgment. When the first settlers arrived in Oswego County in the eighteenth and nineteenth centuries, the County was a forested wilderness. As the Commission found in its original opinion, during the century that followed, lumbering was one of the principal occupations of the County's inhabitants. In 1860 Oswego County had more than 200 sawmills in operation. More than 25 percent of these were located in towns on the Salmon River. The Commission in its original decision found that "[m]aps of 1854 and 1867 show numerous sawmills along the banks of the Salmon River, and some tributary streams, from the area of the headwaters down to the mouth." (emphasis supplied) The Town of Orwell had 16 sawmills and 16 shingle mills. Richland had 19 sawmills and 8 shingle mills. Albion had 38 sawmills. Redfield had at least 6 sawmills. One would have to blink reality to conclude that the inhabitants of these sparsely settled towns used the many thousands of feet of lumber that these mills produced each year. Indeed, John C. Churchill's observation that "the wealth of distant markets flowed into the coffers of the proprietors" of the mills is cogent evidence that they did not.
 
 
 29
 Because the first railroads did not reach the Salmon River area until the nineteenth century was two-thirds over, a logical and feasible route for interstate and foreign transportation was via the harbor at Port Ontario. This was described as a good natural harbor capable of handling ships of up to 60 tons burden. At one time a great city was projected at Port Ontario as a rival for the port at Oswego, some twenty miles to the west. We are at a loss to understand how the Commission could overlook undisputed historical evidence that commerce through the harbor consisted primarily of forest and dairy products and fisheries.
 
 
 30
 We already have noted that in the early part of the nineteenth century it was estimated that up to 1,200 barrels of salmon were caught annually in the river "which [found] a ready market at 8 to 10 dollars a barrel." Obviously, the local inhabitants were not purchasing 1,200 barrels of fish each year, when fish could be taken with very little effort directly from the river. In its final order denying rehearing, the Commission made the unimpressive observation that "even though Port Ontario, situated at the mouth of the Salmon River, may have shipped fish caught in the river to other states and countries by sea, there is no showing that fish caught in the river were transported downstream to Port Ontario from as far upstream as the project site." The fact of the matter, according to the historical records, is that the best salmon fishing was not at the mouth of the river but upstream. There are abundant historical references to the fact that Indians canoed on the river and camped for weeks along its banks where they dried the fish they caught. One historian noted that at the very foot of the falls there was a deep pool abounding with salmon and trout.
 
 
 31
 Evidence of the use of the river by small boats was not limited to historical references to Indian canoes. The Commission has recognized that the use of a river by canoeists "demonstrat[es] the stream's availability for commercial navigation." Zinkie, supra, at p 61,113. Following the Supreme Court's lead in United States v. Utah, 283 U.S. 64, 82, 51 S.Ct. 438, 443, 75 L.Ed. 844 (1931), this court has done the same. See Connecticut Light & Power Co. v. FPC, supra, 557 F.2d at 354-57. For similar authorities see Alaska v. Ahtna, Inc., supra, 891 F.2d at 1405; North Dakota v. Andrus, supra, 671 F.2d at 277-78, and 33 C.F.R. § 329.6(a). The Commission was informed that, as of the present time, more than 30 licensed fishing guides ply the river in drift boats. There was also undisputed evidence that canoeists travel the river, with occasional portages, from beyond the east end of the Salmon Reservoir to Port Ontario at the mouth of the river. There are eight access points along this route where boats can be launched into or removed from the river. The most westerly of these is at Selkirk Shores State Park which is opposite Port Ontario at the mouth of the river. In view of this undisputed evidence, the Commission's statement that the evidence "did not support a finding of present recreational boating from the site of the projects to the mouth of the river" can only be described as clearly erroneous.
 
 
 32
 There are significant adverse recreational and environmental effects that result from Niagara Mohawk's unregulated dominance of the Salmon River. By opening and closing its sluicegates, Niagara Mohawk can raise or lower the depth of the river as much as two feet. The Commission was informed that the release of water, and the velocity that results, can catch the uninformed by surprise and even result in tragedy. It may well be that the public is entitled to more protection than signs that warn of "Swift Current and Fast-Rising Water." The Commission also was informed of the numerous adverse effects on the ecosystem caused by Niagara Mohawk's unregulated dewatering. It is somewhat ironic for example that the State, which constructed a large fish hatchery near the falls, is required to purchase water from Niagara Mohawk to meet its water requirements for that hatchery. The adverse effects of Niagara Mohawk's control of the river on boaters and fishermen and the resultant financial losses to neighboring communities also have been well documented.
 
 
 33
 Whatever effects will result, we are convinced that the largely undisputed facts, assessed in the light of pertinent legislation and judicial precedent, establish the navigability of the Salmon River. The Commission's order of December 6, 1990, which holds that Niagara Mohawk's projects need not be licensed, is set aside.
 
 
 
 [1]
 As is evidenced by the Commission's order of February 4, 1991, the substance of the arguments that petitioner and its amicus now present on appeal were presented to the Commission in sufficient depth to satisfy the requirements of 16 U.S.C. § 825l(b). See Indiana & Michigan Elec. Co. v. FPC, 502 F.2d 336, 339-40 (D.C.Cir.1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). We reject respondents' further contention that petitioner, the New York State Department of Environmental Conservation, is not an aggrieved party under § 825l(b). Petitioner contends that the Commission's order will prevent it from carrying out the duties imposed upon it by § 3-0301 of New York's Environmental Conservation Law. See Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608, 615-16 (2d Cir.1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966)
 
 
 [2]
 "Streams which have been used for navigation, or for floating logs or other purposes, have, for many years, been known as highways." In re Burns, 16 A.D. 507, 513, 44 N.Y.S. 930 (N.Y.App.Div.1897)